IN THE SUPREME COURT OF MISSISSIPPI
NO. 94-DP-01200-SCT

*TRACY LEE WEST*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/11/94 |
| TRIAL JUDGE: | HON. JAMES E. THOMAS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES L. DAVIS, III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE STAEHLE LEE |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | CONVICTION AFFIRMED; SENTENCE OF DEATH VACATED; REVERSED - 6/25/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/1/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Tracy Lee West was convicted of capital murder and sentenced to death in August, 1994. Although we find no merit in any of the issues raised with regard to his conviction, we reverse his death sentence because his jury was not instructed that it could sentence him to life without parole.

**I.**

¶2. On December 15 or 16, 1992, Tracy West left Pulaski, Tennessee on a road trip along with two of his friends, Paul Rathe and Scott Cothren. West did not know where they were going, and did not bring along any extra clothes because he did not realize that they would be gone for awhile. They were riding in a car that Rathe had stolen from a truck driver who lived in Pulaski. They traveled to Alabama, where they robbed a convenience store and Cothren thereafter murdered the store clerk. On December 16, they then drove to Gulfport, Mississippi, where Cothren threatened to shoot Rathe

and West if they did not rob another convenience store and kill the clerk. Rathe and West entered and robbed the cash drawer of the store. West then shot the clerk, Azra Garriga Kiker, and she died immediately.

¶3. Cothren, Rathe and West then proceeded to New Iberia, Louisiana, where they stopped to stay at the home of Mrs. Babineaux, who was the aunt of a friend of theirs. On December 20, Rathe and West were arrested in connection with a report that the car in which they were riding was stolen. Pursuant to these arrests, the law enforcement officers searched the Babineaux home and recovered a pistol that was later determined to be the weapon that killed Ms. Kiker. Cothren was arrested soon thereafter.

¶4. Cothren, Rathe and West were indicted for Ms. Kiker's murder on March 23, 1993. The prosecution elected to try West first, and his trial began in Gulfport on August 8, 1994. At trial, the evidence showed that West, at the urging of Cothren, had entered a convenience store, robbed the cash drawer, ordered Ms. Kiker to lie down on the floor, and then shot her in the back of the head after she asked him not to kill her. The gun misfired the first time, but West shot her twice. The next day, the jury found West guilty of capital murder. After the sentencing phase, the jury returned a sentence of death, finding the following three aggravating circumstances: (1) the offense was committed during the commission of an armed robbery; (2) the offense was committed for the purpose of avoiding a lawful arrest; and (3) the offense was especially heinous, atrocious or cruel.

¶5. West filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for a New Trial, on August 23. This motion along with its supplement raised a total of 44 assignments of error. The Motion was denied on November 21, 1994, and West's execution was set for December 16, 1994. West then appealed to this Court. We will address in this opinion only those matters that affect our disposition or are likely to recur on retrial.

¶6. We first consider the propriety of West's death sentence, and next, the propriety of his conviction.

## II.

### A. *SENTENCING PHASE ISSUES*

#### *i.*

¶7. West first argues that the trial court committed reversible error in refusing his repeated requests to apply the amendments to Miss. Code Ann. §§ 97-3-21 and 99-19-101, and to instruct the sentencing jury that it could sentence him to life imprisonment without parole. Prior to the amendments, defendants who were convicted of capital murder could only be sentenced to either death or life with the possibility of parole. Section 97-3-21 was amended just prior to West's trial, and provided that "Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f)." The amending act also provides that "[t]he provisions of this act shall apply to any case in which pre-trial, trial or resentencing proceedings take place after July 1, 1994." 1994 Miss. Laws, Ch. 566 § 5.

¶8. As noted above, West's trial commenced on August 8, 1994. Thus, he repeatedly requested that

the court apply these amendments to his case, and accordingly instruct the jury that they could consider both death and life without parole: in a pretrial motion, in several suggested jury instructions which were refused by the court, and on the record in several discussions with the judge directly. At one point, the court asked West directly whether he wanted to be tried and sentenced under the new statute, to which he responded affirmatively.

¶9. The trial court denied West's requests in a bench ruling in which he stated that he would not instruct the jury to consider all three sentencing options because West had been indicted, arraigned, and had his trial set before these amendments were enacted. He believed that he was acting within his discretion in denying West the benefit of the amendments. Thus, West was sentenced under the prior scheme, the options being either death or life with the possibility of parole.

¶10. West repeated his request that the jury be instructed about the possibility of life without parole during its deliberations when it sent a note to the court which asked "Does a life sentence allowed (sic) for parole when rendered by the jury or the state?" In response, the judge wrote: "You have received all the instructions I am allowed to give." Finally, West raised the error in his Motion Notwithstanding the Verdict.

¶11. In this appeal, West argues that this ruling was reversible error for several reasons. First, he cites the unambiguous language of the Act which amended §§ 97-3-21 and 99-19-101, which states that these amendments were to apply to any case in which pre-trial, trial, or resentencing proceedings would occur after July 1, 1994. He further argues that statutory amendments are to be applied retroactively where their language indicates that the legislature intended them to apply retroactively. In support of this, West cites two civil cases, *Mladinich v. Kohn*, 186 So. 2d 481, 483 (Miss. 1966) and *City of Clarksdale v. Mississippi Power and Light Company*, 556 So. 2d 1056, 1058 (Miss. 1990).

¶12. West next argues that since West stated that he viewed the amendments as favorable to him, he was entitled to have them applied to his case. He cites *State ex rel. Pittman v. Ladner*, 512 So. 2d 1271, 1276 (Miss. 1987), and Miss. Code Ann. § 99-19-33. He also argues that the Eighth Amendment required the trial court to give West the benefit of the amendments since his was a capital case, and that any ambiguity about whether the statutes applied had to be resolved in favor of West, since he was a criminal defendant.

¶13. Finally, West argues that since other capital defendants who were similarly situated were allowed to receive the benefit of the amendments, the trial court's failure to do so in this case violated the Eighth Amendment's prohibition of arbitrary and capricious sentencing in capital cases.

¶14. This Court has repeatedly held that unless there is sufficient language to the contrary, the words of a statute are to be interpreted according to their usual and most common sense meaning, and that statutes will be given a practical application consistent with their wording, unless the application is inconsistent with the obvious intent of the legislature. *Marx v. Broom*, 632 So. 2d 1315, 1318 (Miss. 1994); *State v. Lee,* 196 Miss. 311, 17 So. 2d 277 (1944). Where the language is plain, this Court will interpret a statute as written. *Mississippi State Dep't. of Human Servs. v. Forrest County Youth Court*, 663 So. 2d 580, 581 (Miss. 1995).

¶15. In this case, the plain meaning of the language in § 97-3-21 indicates that the legislature

intended any defendant whose pretrial, trial, or sentencing proceedings commenced after July 1, 1994 to have his sentencing juries instructed on the sentencing options of life, life without parole, or death. Contrary to the State's suggestion, there is no rational reason to conclude that the legislature, notwithstanding the clarity of this language, intended it to apply only to those defendants who had been charged after July 1, 1994, as were the amendments to § 47-7-3, which were enacted at the same time. Indeed, it is precisely *because* the statutes were amended together that it makes more sense to conclude that the distinction included *was* intended. Section 97-3-21 expressly provides capital defendants whose pretrial, trial *or* resentencing proceedings occur after July 1, 1994 with the possibility of a sentence of life with eligibility for parole as provided in § 47-7-3(1)(f); Section 47-7-3(1)(f) expressly eliminates that possibility of parole for any capital defendant who is "charged, tried, convicted, *and* sentenced to life imprisonment" after July 1, 1994 (emphasis added). When read *in pari materia*, the two statutes provide juries with the option of sentencing capital defendants to life without parole as long as *any* proceeding, from pretrial through resentencing, that follows the actual charge occurs after July 1, 1994. Simultaneously, the two statutes preclude the parole board from granting parole to any capital defendant who was charged after July 1, 1994.

¶16. We hold that these two statutes are not in conflict, and present no ambiguity about whether the legislature intended the amendment to § 97-3-21 to apply to capital defendants whose charge predated July 1, 1994. Absent any ambiguity, this Court will of course interpret the statutes to mean what they plainly say. Contrary to the State's first argument, neither § 99-19-1 nor *Byrd v. State*, 143 So. 852 (1932) suggest otherwise. Section 99-19-1 provides that all laws prescribing punishment will continue to govern the penalties of all crimes committed under them, notwithstanding amendatory or repealing statutes, *unless otherwise especially provided in such statutes.* The amendment to § 97-3-21 especially provides that it is to apply to crimes that were committed before its effective date. Thus, the proscriptions of § 99-19-1 do not preclude the application of the amendments to West. Likewise, in *Byrd* we held that an amended statute that prescribed a lighter penalty than what had been the law at the time of the crime could not be retroactively applied where the amended statute did not specify that it was to apply retroactively. *Byrd v. State,* 143 So. 852.

¶17. Regardless of the unambiguous intentions of the statute, the amendment could not have been applied to West if doing so would have violated the constitutional prohibition on *ex post facto* laws, in that the amended statute prescribes an additional punishment, life without parole, that was not possible at the time that West committed his crime. We have held that amendments which are ameliorative or procedural do not violate the prohibition against *ex post facto* laws. *Johnston v. State*, 618 So. 2d 90, 95 (Miss. 1993). Thus, the initial inquiry in this case is whether the addition of the possibility of a sentence of life without parole ameliorates the previous sentencing scheme.[1]

¶18. Although this Court has never explicitly held that the option of life without parole is ameliorating, we have held that a jury's awareness of the option may be a mitigating factor in capital cases. In *Taylor v. State,* 672 So. 2d 1246 (Miss. 1996), Taylor was convicted of capital murder, which he had committed while on parole from a life sentence for another murder. Because the trial court failed to conduct an habitual offender hearing prior to the capital sentencing proceeding, the jury never knew that Taylor was eligible for a sentence of life without parole. We held that because fundamental fairness requires that capital juries must have as much information as possible in front of them when making their sentencing determination, the trial court committed reversible error in failing to reveal to the jury that Taylor would be ineligible for parole if they returned a life sentence. We

noted the ameliorative effect of the option of life without parole in capital cases: "Had the jury been aware of Taylor's habitual offender status [and his subsequent ineligibility for parole], they might have opted for a life sentence." *Taylor*, 672 So. 2d at 1273 (citing *Turner v. State*, 573 So. 2d 657 (Miss. 1990)).

¶19. It hardly needs restating that death penalty jurisprudence revolves around a theme that any quality of a life sentence is a favorable option to death, the final and ultimate sentence. *See, e.g.*, *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) (capital juries must be allowed to hear any evidence that would tend to support a sentence less than death); *Zant v. Stephens,* 462 U.S. 862, 884-85 (1983) (announcing the heightened need for reliability and due process in capital cases because death is a punishment different from and more severe than all others). Thus, life without parole is typically considered to be a more desirable punishment than death. Since death was an available punishment under both the pre-amended version of § 97-3-21 and the amended version, the option of life without parole arguably does not *increase* the punishment authorized under § 97-3-21 in the manner that is prohibited by the principles of the *ex post facto* clauses. It is axiomatic that for a law to be *ex post facto* it must increase the penalty by which a crime is punished or makes conduct criminal which theretofore was not criminal. *Dobbert v. Florida,* 432 U.S. 282, 294 (1977); *California Dep't. of Corrections v. Morales*, 514 U.S. 499, 506 n. 3 (1995).

¶20. We hold that the sentencing option of life without parole is ameliorating in our capital sentencing scheme. Moreover, it is fairly clear that in this case, the option would have been beneficial to West. After half an hour of deliberation, the jury sent out a note asking whether West would be eligible for parole if it gave him a life sentence. After the judge replied that he would not give the jury any further elaboration on the meaning of a life sentence, it deliberated for almost two more hours before returning a sentence of death.

¶21. Although the State discourages this Court from inferring any conclusion that the jury would have given West life without parole had it been able to do so, the jury's question indicates at the least its contemplation of West's eligibility for parole. It requires no intellectual strain to conclude that the jury may well have sentenced West to life without parole, had it been instructed that such a sentence was possible.

¶22. Having held that the application of the amended capital sentencing statute ameliorates the stark options that were presented to pre-amendment juries, we find that its retroactive application (as expressly provided in the statute) does not give rise to an illegal *ex post facto* law. West was entitled to its application in his case, and the trial court's failure to do so constitutes reversible error.

¶23. Additionally, West is entitled to receive the benefit of the amended § 97-3-21 since he plainly waived any arguable *ex post facto* claim. It is clear, as demonstrated earlier in this opinion that the sentence in question is permitted by the statute as passed by the legislature. West's constitutional right to be free from an *ex post facto* sentence is subject to a knowing waiver. *See, e.g., Stevenson v. State,* 674 So. 2d 501, 506 (Miss. 1996).

¶24. West's waiver arose in the following colloquy with the trial court:

THE COURT: . . . In the meantime, your position is still that the act [which would become § 97-3-21] is applicable and you want the benefit of the act, and knowing that you have to have a

continuance to July 1, or after, right?[(2)]

MR. DAVIS: Correct, your Honor.

MR. SMITH: Yes, Your Honor.

THE COURT: Your counsels have talked to you about this, I take it, Mr. West?

THE DEFENDANT: Yes, sir.

THE COURT: You understand exactly what we are talking about here?

THE DEFENDANT: Yes, sir.

THE COURT: State's position would be that if you are tried after July 1 and I held that you did come under the nonparolable or 20-year statute, that the jury, if they failed to agree on punishment or if they gave you a life sentence, they could do it without parole. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And if you tried to renege on that later, of course the State's position would be that you couldn't renege, or if you did, they could come back and ask for a death sentence with the jury not being told that the sentence would be anything other than life if it is life. Do you understand that?

THE DEFENDANT: (Nods affirmatively.)

THE COURT: Sir?

THE DEFENDANT: Yes.

¶25. A similar waiver enabled Johnny Rufus Lanier, another of this State's capital defendants, to obtain a sentence of life without parole, notwithstanding the fact that his crime and conviction occurred prior to the provision of such a sentencing option. Lanier had first entered a plea agreement in which he agreed to be sentenced to life without parole in exchange for the State's foregoing any right to seek a death penalty. At the time of this deal, the law did not allow any sentence of life without parole for capital defendants. This Court reversed that sentence on the grounds that Lanier could not form a contract to obtain an otherwise illegal sentence. *Lanier v. State,* 635 So. 2d 813 (Miss. 1994).

¶26. Following that reversal, § 97-3-21 was amended to provide the option of life without parole to capital defendants. Lanier's sentencing judge conducted a colloquy in which he asked Lanier repeatedly whether he wanted to waive any ex post facto rights that he might have in not being sentenced to life without parole. After finding that Lanier had waived his rights to both a sentencing trial and the avoidance of ex post facto applications, the court ordered Lanier to serve life without parole.

¶27. Several other capital defendants whose crimes were committed before the effective date of the amendment have received the amendment's benefit after waiving any ex post facto claims. *See Woodward v. State*, No. 95-DP-00144-SCT (this Court issues mandamus ordering trial judge to

accept waiver and apply amended statute, 9/11/95); *State v. Dufour*, 483 So. 2d 307 (1986) (Hinds County Circuit Court entered order finding defendant had waived ex post facto claim, 2/14/95); *State v. Ware*, 2076 (Madison County Circuit Court; jury instruction allowing return of life without parole, filed 12/6/94).

¶28. Thus, it appears that West's waiver of any *ex post facto* claims is a procedure that has been regularly applied in other cases. Indeed, the colloquy that was conducted by the trial judge reflects a sufficient waiver: West told the court that he understood that he could not renege on his agreement to be exposed to the possibility of life without parole notwithstanding the fact that this sentence was not available at the time of his crime. He also told the Court that his attorneys had explained the meaning of this to him. Thus, even if he had a valid claim in light of his waiver of any *ex post facto* error, West was entitled to have the sentencing option of life without parole available to him.[(3)]

¶29. The State has also argued that the trial court had the discretion to decline to apply the amendment, under *Allen v. State*, 440 So. 2d 544 (Miss. 1983) and § 99-19-33. Neither of these authorities, however, provide the trial judge with that sort of discretion. First, § 99-19-33, when read in its entirety, does not grant a judge discretion in the manner urged by the State. The statute reads as follows:

> If any statute shall provide a punishment of the same character, but of milder type, for an offense which was a crime under pre-existing law, then such milder punishment may be imposed by the court but no conviction, otherwise valid, shall be set aside and new trial granted merely because of an error of the court in fixing punishment. Such error shall only entitle the party injured to vacate or reverse the judgment as to the punishment, and the legal punishment shall then be imposed by another sentence based on the original conviction or plea of guilty.

¶30. Although the language seems to suggest discretion in stating that the lighter sentence *may* be imposed by the court, the subsequent sentence states that a judge's failure to impose the lighter sentence is error. Moreover, such error entitles the party injured to a vacation or reversal of the punishment portion of the judgment. Thus, it appears that the use of "may" in the first sentence in fact intends to convey "shall," for there can be no discretion to decline to apply an amendatory provision if declining to do so results in reversible error. This Court has held that while permissive language of a statute is presumably interpreted in its ordinary sense, it will be interpreted as mandatory where the context compels such a construction. *Leflore Bank & Trust Co. v. Leflore County,* 202 Miss. 552, 558, 32 So. 2d 744, 746 (1947). Thus, a harmonized reading of § 99-19-33 compels this Court to construe "may" as "shall."[(4)]

¶31. Furthermore, the State's reliance on *Allen v. State,* 440 So. 2d 544 (Miss. 1983) is of no avail. *Allen* is the only case which interprets § 99-19-33 to afford trial judges the discretion to apply the pre-amended statute. That holding, that trial courts had discretion to enforce a pre-amended version of a statute, was expressly overruled in *State ex rel. Pittman v. Ladner,* 512 So. 2d 1271, 1277 (Miss. 1987), in which this Court held:

> . . . [I]n litigation between the state and an individual, where the operative statute has been repealed or amended and the litigation arises out of a pre-repeal, pre-amendment transaction or occurrence, the individual may claim and be given the benefit of the prior law in effect at the operative time where he regards it as more favorable to him. But the converse is not necessarily

so. Unless the state holds a contract or otherwise has a vested right, a repealed or amended statute will ordinarily not be enforced against an individual where he regards it as less favorable to him.

West quite clearly regarded the amended version of § 97-3-21 to be more favorable to him, since he moved on so many different occasions to have it applied to him. Thus, under *Ladner,* the trial court had no discretion to decline to apply the amendment, and thus his failure to do so was error.[(5)]

¶32. Because we find that Miss. Code Ann. § 97-3-21 clearly and lawfully directed capital defendants whose pre-trial, trial or resentencing proceedings take place after July 1, 1994 to have their sentencing juries given the option of life without parole in addition to life with the possibility of parole and death, we hold that the trial court's failure to give West's jury that option to be reversible error. We accordingly vacate West's death sentence.

*ii.*

¶33. West also argues that his sentence must be reversed because the jury's finding that his offense was especially heinous, atrocious, and cruel was against the overwhelming weight of the evidence and was not sufficiently limited through the trial court's instruction. West unsuccessfully moved prior to trial to preclude the State from arguing that this offense was especially heinous, atrocious, or cruel. West further objected to the State's instructions on this aggravating factor, arguing that the instructions were vague, overbroad, and unsupported by the evidence.

¶34. The relevant instruction read as follows:

The Court instructs the Jury that an especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders -- the conscienceless or pitiless crime which is unnecessarily tortuous [sic] to the victim.

¶35. West argues that this instruction fails to meaningfully narrow that class of murders that could fall within its scope in accordance with the Eighth and Fourteenth Amendments to the federal Constitution. This Court has held that the proper instruction is as follows:

What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Carr v. State,* 655 So. 2d 824, 851 (Miss. 1995) (quoting *Coleman v. State,* 378 So. 2d 640, 648 (Miss. 1979)). Since the instruction given to West's jury instruction is identical to this model in all relevant aspects, this argument is without merit.

¶36. West also objected on the grounds that the evidence did not warrant the instruction. West had told the police that "As [the victim] laid down there I was trying to shoot the gun and stuff and I never could get it to shoot, I cocked it and I finally got it to shoot and then I cocked it, shot the second shot but I didn't cock the empty shell out there." He also stated that Ms. Kiker said, "Please don't kill me, I got one kid," as she lay face down on the floor.

¶37. West presently argues that no rational juror could have concluded from the evidence that Ms. Kiker's murder was conscienceless, pitiless, or unnecessarily torturous. In particular, he urges that the fact that West did not intend the gun to misfire precludes holding him accountable for the torture that Ms. Kiker underwent while she lay on the floor. He cites two cases in support of this. In *Walton v. Arizona,* 497 U.S. 639, 654 (1990), the Supreme Court approved a sentencing scheme whereby the heinous, atrocious, and cruel aggravator was limited to those situations where the suffering of the victim was intended by or foreseeable to the killer. Likewise, the high Court in *Lewis v. Jeffers,* 497 U.S. 764 (1990), upheld a state court's finding that the evidence rationally supported the finding that the murder was heinous, atrocious, or cruel where the evidence indicated that the defendant had both relished the crime and inflicted gratuitous violence to the victim. Notably, neither of these cases hold that a defendant *must* have specifically intended the lingering death in order to constitutionally support a finding that the killing was especially heinous, atrocious, or cruel.

¶38. This Court has never held that a torturous or lingering death must have been intended by or foreseeable to the killer in order to come within the meaning of especially heinous, atrocious, or cruel. In *Hansen v. State,* 592 So. 2d 114, 152 (Miss. 1991), however, we held that barbarity sufficient to satisfy this aggravating circumstance can be demonstrated where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim. *Id.* (*citing* *Pinkney v. State,* 538 So. 2d 329, 357 (Miss. 1988)).

¶39. In this record, however, such barbarity is not in evidence. Regardless of whether West is required to have intended the torture, there is no evidence in the record that Ms. Kiker *heard* the gun misfire, or that there was any considerable length of time between the misfire and the shot that killed her. The only evidence that she was suffering mental torture was the fact that she asked West to spare her life while she lay on the floor. Nothing in our caselaw, however, suggests that this is enough to elevate a murder into an especially heinous, atrocious, or cruel one. In *Evans v. State,* 422 So. 2d 737, 743 (Miss. 1982) this Court stated that a homicide in which the victim was forced to kneel on the floor at gunpoint while his pockets were emptied and shot a short period later would not constitutionally suffice for the aggravating factor of "especially heinous, atrocious or cruel." Following the pre-*Clemons* formula, the Court nevertheless affirmed the sentence on the grounds that the three other aggravating factors had been proved by overwhelming evidence. Likewise, in *Jordan v. State,* 464 So. 2d 475, 478 (Miss. 1985), *vacated on other grounds*, 476 U.S. 1101 (1996), this Court found that where the victim had been abducted and shot in the back of the head while on her knees, the aggravator was supported *only* by the fact that she had been running, trying to get away from him, and thus was frightened.

¶40. No similar evidence was presented in this case to support an added finding that Ms. Kiker suffered mental torture sufficient to distinguish this murder from the norm of capital felonies. *Taylor v. State,* 672 So. 2d 1246, 1276 (Miss. 1996). Although all murder is surely cruel, we must be especially diligent in our distinction of the most conscienceless and pitiless murders from the trauma that tragically attends them all. The facts of this case do not, in the context of our caselaw on this aggravating factor, appear to support the "heinous, atrocious, and cruel" instruction. The only clear evidence of mental torture in this case is the fact that she begged West not to kill her. It troubles us that the trial court found that this fact alone "set the crime apart from the norm of capital felonies -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Carr v. State,* 655 So. 2d 824, 851 (Miss. 1995). Although we will not rule on the issue, since it may not recur at retrial,

we do strongly question whether the "heinous, atrocious, and cruel" instruction was warranted on the evidence that appeared in this record.

### iii.

¶41. West also argues that the court erred in instructing the jury that the offense was committed for the purpose of avoiding unlawful arrest. This assignment of error is without merit. There was evidence in the record which, if taken in the light most favorable to the verdict, demonstrated that the killing was committed to extinguish witnesses. In his confession to the police, West stated that he had shot Ms. Kiker because Cothren did not want any witnesses left behind. Furthermore, West testified during the guilt phase that "[Scott Cothren] said he was going to shoot us if -- if we didn't shoot the woman in there because he didn't want no witnesses left in the store." Thus, there was sufficient evidence in the record to support the submission of this aggravating factor.

¶42. West also argues that this instruction, as given, was impermissibly vague and overbroad. The instruction reads as follows: " . . . [t]hat the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." This Court has rejected this argument about this version of the instruction in *Chase v. State,* 645 So. 2d 829, 858 (Miss. 1994). Thus, this assignment of error is without merit.

### iv.

¶43. West contends that the trial court erroneously denied him the opportunity to present several offers of evidence in mitigation. Specifically, West unsuccessfully tried to introduce the following: testimony that his father was a drunkard and a bad husband to his mother; a photograph of West as a child; and evidence that he cared for an elderly woman who was on an oxygen machine.

¶44. This Court has adopted quite broadly the United States Supreme Court's command in *McCleskey v. Kemp,* 481 U.S. 279, 306 (1987), that capital defendants be allowed to introduce at sentencing any evidence which would tend to support a sentence less than death. In *Leatherwood v. State,* 435 So. 2d 645, 650 (Miss. 1983), this Court held that Mississippi would allow "evidence of mitigating circumstances of an unlimited nature" to be admissible in death penalty sentencing hearings, so as to convince the jury that the defendant should not be executed.

¶45. This wide admissibility standard notwithstanding, the trial court committed no error with regard to these particular proffers. The trial court excluded the testimony that West's father was a drunkard because of the form of the question. West's attorney asked his aunt during the sentencing hearing, "What type of husband was R.B. West to his wife, Mrs. West?" The State promptly raised an objection, which the trial court sustained with an admonishment to defense counsel to restate the question. Although West's attorney proceeded to question the witness about what type of father Mr. West had been and where he was living, he never directly asked whether West's father drank or was a drunkard. After the witness had been excused following the State's cross-examination, and another witness had been examined and excused, West's attorney proffered to the court that he was trying to elicit the information that West's father had been a drunkard.

¶46. The trial court asked defense counsel why he hadn't simply asked the witness if West's father was a drunk. Defense counsel replied that he hadn't asked because it would have been a leading

question. The trial court stated "You haven't asked a leading question all week in this case? I'm not sure you've asked a direct question yet of any witness here. That's your fault not mine."

¶47. Thus, it appears that the trial court did not actually preclude West from eliciting this mitigation testimony, so much as it precluded him from asking the question improperly. Indeed, it appears that defense counsel forgot the point of the question or something. In any case, he never actually requested the court to recall the witness in order for him to ask about West's father's drunkenness, although it seems clear from the record that the court would not have been terribly interested in doing that. Thus, it plainly appears that the trial court did not preclude the evidence, and was not in error in sustaining the State's objection to defense counsel's question.

¶48. West also attempted to introduce a photograph of himself as a child. During a pretrial hearing at which the trial court was trying to get a synopsis of the testimony and the witnesses, West stated that he intended to introduce the photo during the sentencing phase, if the case proceeded to that point. The trial court responded that baby pictures were not going to be admitted, although West could make his record at trial. The court added that West would have to show something further to get the picture in. The court returned to the subject of the photograph later in the hearing, stating, " -- if I let you put in baby pictures on him, why don't I let them put in baby pictures that [the victim's] got of her kid or show a photograph of her when she is in the first grade, the victim that is."

¶49. Defense counsel never raised the issue again, and the photograph has not been included in the record. Thus, any error in the exclusion of these photos is procedurally barred, because defense counsel did not raise the query for the court to pass upon at the appropriate time.

¶50. Finally, West contends that the trial court improperly excluded as mitigation the testimony of an elderly lady who was on oxygen and that West cared for some time just before the murder. During the pretrial hearing, the court stated "The fact that he takes care of some old woman who's on an oxygen machine, though, to me is not admissible. I don't think. That is pure sympathy." This woman was Nancy Curtis, who did testify during the sentencing that: "[West] came to my house often to see about me, take care of me, take out my trash and go to the store for me, just anything that he could do." Defense counsel never questioned Ms. Curtis about the oxygen machine in particular, and now argues that he did not do so out of respect for the trial court's "ruling" during the pretrial hearing. This argument is without merit; it is either procedurally barred to the extent that West never asked the witness the question while she was on the stand, or, alternatively, it is moot to the extent that the witness did testify that West had taken good care of her.

*v.*

¶51. West next contends that the trial court erroneously sustained the State's objections to the expert qualifications of Dr. Zimmerman, a psychologist, in a manner that discredited him in front of the jury. West suggests that he was prejudiced by the exchange since Dr. Zimmerman provided critical testimony during the sentencing hearing that West is mentally retarded and suffers from organic brain dysfunction, and thus his credibility was especially important.

¶52. At the close of the state's voir dire of the expert on his qualifications, the State objected to Dr. Zimmerman's qualification as an expert in forensic and clinical psychology. The exchange that West found objectionable is as follows:

MR. CARANNA [The prosecutor]: Judge, we object in that his training is not in clinical and forensic psychology, that the associations are membership organizations, and that while he is a trained psychologist, we'd object to the classification of him being a clinical or forensics expert. We stipulate to him being an expert in psychology.

THE COURT: Well, I accept his qualifications in the field for which he is trained. The jury can ultimately judge the credibility of all of your experts.

MR. CARANNA: Thank you.

¶53. This objection, as well as the preceding voir dire, was held in the presence of the jury. West argues that the trial court abused its discretion in failing to qualify Dr. Zimmerman as an expert in forensic and clinical psychology, and that the court's comments discredited Dr. Zimmerman in the presence of the jury.

¶54. After reviewing the record of Dr. Zimmerman's testimony, it is clear that any error that the trial court made was harmless, since West has never proffered any testimony that was restricted because of the trial court's ruling or explained any prejudice that he suffered by the jury's presence during the objection and ruling.

*vi.*

¶55. West next argues that the trial court erroneously allowed the State to ask his mitigation witnesses whether they believed in the death penalty. Although West concedes that this question may have been proper for those witnesses who testified during their direct examination that they did not want West to receive the death penalty, he argues without elaboration that it was an improper question for Richard Brewer and John Turner, the two witnesses who expressed no opinion during their direct examination of whether they wanted West to receive the death penalty. Defense counsel objected promptly on both occasions that the State posed the question. The trial court overruled both objections without comment.

¶56. The State submits that the questions were proper attempts to inquire into the bias of the mitigation witnesses, and thus the trial court correctly overruled the objections. It cites *Tate v. State,* 317 So. 2d 23, 24 (Miss. 1975) and *Stringer v. State,* 477 So. 2d 1335, 1337-38 (Miss. 1985) for the proposition that a witness may be examined as to his feelings about a case, his interest, bias, motives or hostility. It further notes that this Court has held that wide latitude is to be allowed on cross-examination to show bias or motive for the purpose of affecting credibility. *Pulliam v. State,* 515 So. 2d 945, 947 (Miss. 1987) ("[I]f there are doubts as to the relevancy of an inquiry into credibility, interest, bias, or motive, those doubts should be resolved in favor of admissibility.") *Pulliam,* however, involved the latitude to be afforded an accused to cross-examine an informant.

¶57. Although this Court has not addressed this question, West has cited two cases in which such questions were not allowed. In *Lawhorn v. State,* 581 So. 2d 1159, 1173 (Ala. Crim. App. 1990), the Alabama Court of Criminal Appeals held that there was no error where the prosecutor had asked one of the appellant's sentencing witnesses if he believed in the death penalty. The defense counsel's objection was immediately sustained by the trial court, and the prosecutor did not pursue the subject. There is no discussion in that opinion of the basis of the objection or the grounds for sustaining it.

¶58. West also cites *State v. Patillo,* 417 S.E.2d 139, 143 (Ga. 1992), in which the Georgia Supreme Court considered whether the prosecution should be entitled to cross-examine mental-health experts on their beliefs about the death penalty, since in Georgia any defendant found to be mentally impaired was not eligible for the death penalty. The court held that, while it may be relevant whether a mental health expert conscientiously opposed the death penalty, such relevance was outweighed by the risk of prejudice. Under Georgia's statutory scheme, juries were to consider the mental capacity of capital defendants during a separate proceeding, before any question of sentencing arose. Indeed, they were not told that if they found the defendant mentally retarded, a death sentence would be vacated. Thus, the court held that to allow prosecutors to raise the death penalty during this phase would divert the jury from its duty to decide whether the defendant was mentally impaired solely on the evidence. The court concluded that a jury in such a proceeding could adequately evaluate the credibility of witnesses without the injection of the consequences of the jury's verdict.

¶59. In this case, the questions were asked to impeach the witnesses with their possible biases. Under the rule of this Court's decisions in *Stringer, Tate, and Pulliam,* the trial court was not in error in allowing those questions.

*vii.*

¶60. West next argues that the State improperly questioned West's expert mitigation witnesses about whether they thought West knew the difference between right and wrong. West submits that these were improper and irrelevant questions because he never raised an insanity defense at guilt or suggested insanity at sentencing, but merely submitted his mental deficiencies in mitigation. He argues that the error of admitting the testimony was not harmless because the prosecutors later argued during the closing argument "He understood the difference in right and wrong. You heard it from everybody that was up there. He has the accountability that every citizens has to have [sic]."

¶61. This assignment of error is without merit. The State is entitled to rebut West's evidence of his mental deficiencies. *See **Ladner v. State,*** 584 So. 2d 743, 762 (Miss. 1991) (State is entitled to rebuttal as long as it does not suggest that the jury should not consider the mitigating circumstances). Moreover, the jury was instructed to consider explicitly that West was acting under the influence of extreme mental or emotional disturbance, that he was mentally retarded, and that his capacity to appreciate criminality and conform his behavior to the requirements of the law was substantially impaired. Thus, the State's questions constituted acceptable rebuttal.

**B. GUILT PHASE**

*i.*

¶62. West argues that his conviction must be reversed because the trial court committed reversible error in refusing to instruct his jury that it could convict him of simple murder or manslaughter. West was charged with "wilfully, unlawfully, feloniously and without any design to effect death, kill and murder Azra Garriga Kiker . . . while in the commission of the crime and felony of Armed Robbery." West offered two defenses. First, he presented evidence that he was under objective duress in his commission of the armed robbery.[(6)] Alternatively, he argued that because of his subjective fear, coercion and duress, he was unable to form the requisite intent to commit armed robbery, which is a

specific intent crime.

¶63. West theorizes that the jury could have found that, while he had committed the robbery under duress, he committed the killing with deliberate design and therefore would be guilty of simple murder. He further theorizes that the jury could have found that he had committed the robbery under duress and had no deliberate design when he committed the killing, and therefore could be convicted of manslaughter. Accordingly, he submitted several jury instructions which would have invited the jury to return these lesser verdicts. He also objected to the court's and the State's capital murder instructions to the extent that they failed to include any provisions for verdicts of simple murder and manslaughter.

¶64. The trial court did grant West an instruction on the meaning of objective duress insofar as it could support a defense to the armed robbery element of the capital murder charge:

> Evidence has been presented that the defendant acted under duress in committing the crime of armed robbery.
>
> "Duress" is the exercise of unlawful force upon a person whereby that person is compelled to do some act that he otherwise would not have done. In order for duress to be a defense to a criminal charge, the impelling danger must be present, imminent, and impending, and of such a nature as to induce in a person well-grounded apprehension of death or serious bodily harm if the act is not done.
>
> If the State has failed to prove from the evidence in this case beyond a reasonable doubt that the defendant acted voluntarily in committing the crime and not under duress, then you shall find the defendant Not Guilty of Capital Murder.

¶65. Nevertheless, the court refused to instruct the jury on the lesser offenses of murder and manslaughter, stating "I think you've either got capital murder, which is frankly admitted to even by his -- set aside the confession. His statement to the jury in the light most favorable to him, it's a confession of capital murder but under duress. I'm going to send it to the jury only on capital murder."

¶66. A criminal defendant is entitled to have his jury instructed on all offenses of which an evidentiary basis exists in the record, even where the evidence might be weak, insufficient, inconsistent, of doubtful credibility, or arises only in the defendant's own testimony. Where a reasonable jury could find under the evidence that the defendant was not guilty of the principal charge made in the indictment, but guilty of a lesser included offense, the trial judge ordinarily should instruct the jury regarding the elements of that lesser included offense. *Welch v. State,* 566 So. 2d 680, 684 (Miss. 1990); *Davis v. State,* 530 So. 2d 694, 701 (Miss. 1988). This Court has held that where the evidence can justify a conviction of the principal charge should lesser include offense instructions be refused. *Ruffin v. State,* 444 So. 2d 839, 840 (Miss. 1984).

¶67. Furthermore, the United States Supreme Court has held that a death sentence cannot be constitutionally imposed when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense when the evidence would have supported such a verdict. *Beck v. Alabama,* 447 U.S. 625 (1980). The concern is that a jury who may be convinced that the defendant

had committed some terrible crime but is not convinced that he was guilty of the capital charge would nevertheless return a capital conviction if the only alternative was to set the defendant free. *See **Schad v. Arizona,*** 501 U.S. 624 (1991).

¶68. In this case, West provided the following testimony on direct examination about the robbery, the killing and his corresponding state of mind:

Q. Okay. You recall the last time you-all pulled up in front of that convenience store prior to you going inside?

A. Yes, sir.

Q. Did something happen out there in the car?

A. Yes, sir.

Q. What was that, Tracy?

A. He wanted us to flip a coin to see who was going in to do the shooting.

Q. Okay. Who is "he"?

A. Scott Cothren.

Q. What was he doing when he was telling you-all about this coin flipping?

A. He had the gun pointed at us.

Q. And what was he saying?

A. He was telling us if we didn't go in and do it, he was going to shoot us.

Q. Okay. And go ahead and tell what happened when you-all were flipping this coin, Tracy?

A. Well, the first time we flipped and stuff, I won and stuff. And then Paul was supposed to have been going in, but then they wanted to do the best two out of three, and I ended up losing the second time.

Q. Okay. And what happened after that, Tracy?

A. We ended up going into the store.

Q. Okay. And Scott gave you the pistol?

A. Yes, sir.

Q. And you got out of the car?

A. Yes, sir.

Q. And, Tracy, when you got out of the car, did Scott have a pistol in the car with him?

A. No, sir.

Q. Why didn't you run when you got out of that car?

A. I was scared and wasn't thinking.

Q. You went into the store, and what did you do when you got into the store, Tracy?

A. Robbed it.

Q. Okay. Why did you rob the lady, Tracy?

A. Because Scott told us to.

Q. Okay. What did you think would happen if you didn't rob it?

A. That he'd kill us.

Q. And after you robbed the store, you did shoot the clerk; is that right?

A. Yes, sir.

Q. Why did you shoot the lady, Tracy?

A. Because he said he was going to shoot us if -- if we didn't shoot the woman in there because he didn't want no witnesses left in the store.

Q. Now, when you got back to the car, did you have the money on you?

A. No, sir.

Q. Who was the money on?

A. Paul.

Q. What did Scott tell you when you got back to the car?

MR. MARTIN: Objection.

THE COURT: Sustained.

BY MR. DAVIS:

Q. How did Scott act towards you when you got back to the car?

A. Good.

Q. Okay. How did he act toward you? You said "Good." Would you explain that without saying what Scott said? How did he act toward you when you got to the car?

A. He was acting better towards me.

¶69. During the State's cross-examination, West testified as follows:

Q. Okay. Now, there was one gun in that car, right?

A. Yes, sir.

Q. So when you got out of that car and went in that store with Paul, this person that you -- that was supposed to have -- that you were supposed to be in such fear of was still in the car, wasn't he?

A. Yes, sir.

Q. Didn't have a weapon in that car, did he?

A. No, sir.

Q. So you went in that store, and you could have called the police, couldn't you?

A. Yes, sir.

Q. You could have said, "I'm not doing this," and went out the back door, couldn't you?

A. Yes, sir.

Q. You had the gun. You could have turned to Scott and said, "No." Couldn't you have done that?

A. Yes, sir.

Q. And there's nothing Scott could have done, is there, because you had the gun, right?

A. Yes, sir.

Q. You didn't do any of that.

A. No, sir.

Q. When you shot this lady in the back of the head two times where she lay there on the floor telling you about her child, you could have fired into the air and went back and told Scott anything, couldn't you? Couldn't you?

A. Yes, sir.

Q. You didn't do that either, did you?

A. No, sir.

Q. You shot her in the head two times, right?

A. Yes, sir.

Q. So this stuff about you being afraid of Scott, you weren't afraid of Scott, were you?

A. Yes, sir.

Q. So afraid of Scott -- Well, was Paul supposed to be afraid of Scott, too?

A. Yes, sir.

Q. So two of you guys, you and Paul, with the gun in you-all's custody, so afraid of Scott that you-all let him tell you what to do while you had the gun.

A. Yes, sir.

Q. But at that point in time when you had the gun and you were in that store, Scott couldn't have done anything to you at that time, could he?

A. No.

Q. He couldn't have -- You weren't in fear of him killing you right then, were you, because you had control, didn't you?

A. I wasn't thinking about it.

¶70. During the videotaped statement that West gave to the police, West stated that he and his two co-defendants had planned to steal the cash drawer from the store. He further stated that he planned to kill Ms. Kiker when he fired the shots at her, and that all three of them had formed the idea to rob that store.

¶71. The State contends that this evidence, viewed in the light most favorable to West, cannot rationally support the lesser included offenses of manslaughter or simple murder. It further argues that no reasonable juror could have found that West did not have the specific intent to rob the convenience store, and that no rational juror could have found that West was under duress. Additionally, the State argues that West got to present his theory of defense and therefore suffered no harm from the lack of lesser included instructions, since the jury was instructed on the meaning of objective duress.

¶72. Our review of the record reveals, taken in the light most favorable to West, the evidence does support at least a simple murder, since he admitted to killing Ms. Kiker and intending to do so. Our review does not however, support any theory of manslaughter or duress. First, the evidence plainly indicated that West indeed shot Ms. Kiker with malice or deliberate design. Indeed, he repeatedly testified to having planned to shoot her. Although he testified on the stand that he shot her because he was afraid of being shot himself by his co-defendant, we have found no caselaw that suggests that "duress" of this kind will reduce a simple murder to manslaughter.

¶73. Second, West's theory of duress is simply unsupported by the evidence. Indeed, as the State suggests in its brief, no rational juror could have concluded that he was robbing the store under threat of impending death. This is particularly true given that West testified during his cross-examination

that he had a number of reasonable and legal alternatives to robbing and killing Ms. Kiker.[7]

¶74. Since West's duress defense is unsupported in this record, we find that the trial court's refusal to grant his request for the simple murder instruction that arose on the duress theory was not error. Even though the trial court did grant the duress instruction, we find that no rational juror could have found West to have been acting under common-law duress.

¶75. West's duress defense may have been strengthened by some evidence that the trial court declined to admit. During his case-in-chief, West attempted to put on several witnesses who would have testified that Cothren was an extremely violent person who had threatened to kill before, and who tended to dominate West. Although this may have further proved the reasonableness of West's fear of Cothren's violent nature, it simply would offer nothing to refute the State's contention that West had numerous opportunities to avoid committing the crime. (*See discussion infra* of admissibility of this proffered testimony, in subsection ii.). Since West's duress defense was irrational on this evidence, we find there to have been no error in the trial court's refusal to grant West the requested lesser-included instructions that arose out of that defense.

### *ii.*

*¶76. In related matters, West contends that the trial court erroneously deprived him of the opportunity to present evidence in support of both his objective duress defense as well as his theory that he was too frightened to form the requisite specific intent. He summarizes the testimony of four separate witnesses who would have been called to show that Cothren (the driver of the car) was known to be extremely violent and stated that he wanted to kill someone, and that he was the leader as between him and West, that West was a follower in general and easily pressured although not the trouble-making sort on his own, that Cothren had been the ring-leader, and that West was mentally retarded.*

*¶77. The State responds that West was not entitled to a duress defense, and in any event the trial court correctly ruled that the proffered testimony was not relevant, since the testimony would have pertained to the witnesses' impressions of West and Cothren, of the relationship between the two, on the day before or several hours after the crime. The trial court disallowed the testimony on these grounds, and further stated that testimony was also irrelevant because it would not relate to any threats, force or duress that were imposed on West by Cothren.*

*¶78. The trial court reiterated this ruling in the sentencing phase with respect to the testimony of Kevin Curtis, whom West sought to have testify during the guilt phase that Cothren was "running the whole show." The trial court stated that his testimony at sentencing did not support any defense of duress. As has been noted, the trial court was not at all amenable to West's theory that his subjective sense of fear and duress undermined his capacity to form the specific intent to rob the store.*

*¶79. This Court has not precisely enunciated the elements of a duress defense in this State, although it has expressly adopted the general rule of other states that where a person reasonably believes that he is in danger of physical harm he may be excused for some conduct which ordinarily would be criminal. **Knight v. State,** 601 So. 2d 403, 405 (Miss. 1992). West contends that the evidence that he attempted to offer was probative of the reasonableness of West's fear of Cothren, given his*

*violent tendencies and stated urge to commit murder.*

*¶80. In accord with our earlier conclusion that West's duress defense was irrational because he testified to having had reasonable and legal alternatives to killing the victim, we find that the trial court's refusal to admit this added evidence regarding his fear of Cothren was not error.*

*¶81. West additionally argues whether these witnesses could have supplied admissible testimony that he was under an impending threat of lethal harm to support his objective duress defense, he was also attempting to adduce evidence through these witnesses about his subjective fear and coercion. As has been noted earlier, he theorized in the alternative that this subjective fear and coercion made him incapable of forming the requisite mens rea to be held liable for the capital murder as charged. The lack of mens rea, according to this theory, would reduce West's capital murder to either simple murder or manslaughter. Since we have already decided that no rational juror could conclude that West did not intend to rob or shoot Ms. Kiker, we hold that this contention is without merit.*[(8)]

### *iii.*

*¶82. West raises several different arguments that his conviction should be reversed because the trial court committed reversible error in failing to suppress his confession and the murder weapon. These arguments were previously raised in West's written pretrial motions.*

*¶83. We find that none of West's arguments have merit. West first argues that the pistol should have been suppressed because the police did not obtain a proper consent prior to conducting the search that recovered the weapon. We hold, however, that the police had obtained proper consent prior to their search, since they obtained it from the owner of the trailer in which West was visiting; the owner and co-occupant had an equal right to use or occupy the room in which the police found the gun. Therefore, her consent was sufficient to authorize the search, and the trial court committed no error in declining to suppress the pistol on this ground.*

*¶84. West next argues that his confession ought to have been suppressed because he did not voluntarily, knowingly, or intelligently waive his **Miranda** rights prior to giving the police the inculpatory statement. In support of this, West notes that, in addition to his being retarded, his "waiver" was given when he was tired and confused, and after a night of heavy drinking and no sleep. Since the police did not read him his **Miranda** rights slowly or carefully or use simplified sentence structure or vocabulary, he cannot be said to have understood them.*

*¶85. The trial court's finding that West's waiver of his **Miranda** rights was intelligent and knowing is a finding of fact that will not be disturbed unless this Court finds it to be clearly erroneous. **Neal v. State,** 451 So. 2d 743, 756 (Miss. 1984). A trial judge should make his determination on the totality of the circumstances of the confession, including consideration of any mental impairment suffered by the defendant. **Id.***

*¶86. The evidence is clear from the videotaped confession that West was read his **Miranda** rights more than once. In fact, Officer Calvanese stopped the interrogation to ask West whether he remembered his rights and whether he was confessing freely, and reminded him of them at the close of the interrogation. The trial judge heard evidence that West has an IQ around 70, and he*

*furthermore observed West testify during the hearing about the events leading up to his confession before concluding that he had been advised of his **Miranda** rights and waived them freely and voluntarily. There was no other evidence in the record that West did not understand his **Miranda** rights nor his waiver of them. Although West's counsel mentioned that he might call a mental health expert to testify about West's capacity to understand his waiver, he did not seek to supplement the record until his Motion for New Trial, at which point the judge ruled that he would not consider the information because it was submitted too late.*

*¶87. This Court has upheld trial courts' findings that a mentally impaired defendant waived his **Miranda** rights knowingly, intelligently, and voluntarily where the fact of the defendant's impairment was known to the court. See, e.g. , **Neal v. State,** 451 So. 2d 743 (Miss. 1984) (defendant had IQ of 54 and organic brain dysfunction was nevertheless held to have lawfully waived **Miranda** rights); **Veal v. State,** 585 So. 2d 693, 697 (Miss. 1991) (mildly mentally retarded defendant who can read and write and appeared to all witnesses to the interrogation to have understood the process held to have voluntarily, intelligently and knowingly waived **Miranda** rights).*

*¶88. In **Smith v. State,** 534 So. 2d 194, 196-97 (Miss. 1988) this Court upheld a trial court's finding that a **Miranda** waiver was lawful in spite of extensive expert testimony that Smith had an IQ of 65, could not read, would not recognize the word "waiver," could not understand multi-syllabic words, and had the minimal skills necessary for daily functioning. This Court held that since the trial court in that case was persuaded by a review of a taped confession that Smith was capable of voluntarily confessing, and had found that the psychological evidence did not outweigh this conclusion, the trial court's ruling was not clearly erroneous. In light of that factual precedent, we hold that the trial court's finding that West's waiver was knowing, intelligent, and voluntary was also not clearly erroneous. This argument is therefore without merit.*

*¶89. West further contends that his statements as well as the pistol should have been suppressed because the police failed to obtain a warrant before arresting him at his residence. In **Payton v. New York**, 445 U.S. 573 (1980), the United States Supreme Court held that the Fourth Amendment prohibits police from making felony arrests of people from within the confines of their homes unless they have an arrest warrant, absent exigent circumstances like a fleeing felon or imminent destruction of evidence. Accord **Wilson v. State,** 433 So. 2d 1142, 1145 (Miss. 1983) (holding lower court should have suppressed a statement that was obtained to an warrantless arrest made in appellant's home).*

*¶90. In **Minnesota v. Olson,** 495 U.S. 91 (1990) the United States Supreme Court held that since Olson had a reasonable expectation of privacy in the residence in which he was spending the night on the floor, the protections of the Fourth Amendment prohibited Olson's arrest in that residence in absence of a warrant or exigent circumstances. The Supreme Court then affirmed the Minnesota Supreme Court's decision to suppress the statement that followed that unlawful arrest. **Id**. at 100 (citing **Payton,** 445 U.S. at 583).*

*¶91. Notwithstanding West's expectation of privacy in the Babineaux trailer, the **Payton** rule does not apply when the police are in the premises pursuant to a lawful consent. **Payton,** 445 U.S. at 583. Given that Mrs. Babineaux, the owner and co-occupant of the trailer, gave the police consent*

*to enter her trailer, the arrest of West within that trailer does not violate the **Payton** rule.*

*¶92. West next contends that his statement should be suppressed because the police arrested him without probable cause, since the police had no knowledge of facts and circumstances grounded in trustworthy information that would warrant a belief by a prudent person that an offense has been committed by the person to be arrested. This Court has held that probable cause arises where a police officer has reasonable cause to believe a felony had been committed, and reasonable cause to believe that the person proposed to be arrested is the one who committed it, as determined by factual and practical considerations of everyday life. **Thomas v. State,** 645 So. 2d 1345, 1347 (Miss. 1994); **Lockett v. State,** 517 So. 2d 1317, 1327 (Miss. 1987).*

*¶93. This contention is without merit. There was ample testimony that the police had good reason to arrest West, along with his buddy Rathe, for having stolen the blue Cadillac in which they were traveling. Mr. Babineaux, the owner of the trailer had called the police to inform them that he knew of four white men, one of whom permanently lived in his home, who had stolen a blue Cadillac. Apparently Mr. Babineaux had overheard Rathe call his mother from the trailer, and tell her that they had taken the car and were currently being held against their will at knife point. Meanwhile, Rathe's mother had called the police in Tennessee, who contacted the police in Louisiana. Detective Myers of the Iberia Parish Sheriff's Office had heard from Detective Vick of Tennessee, who had gotten his information from Rathe's mother, that three or four white men were traveling in a stolen blue Cadillac that may have been involved in armed robbery-homicides. Detective Vick had confirmed that the vehicle was gone from the owner's residence, although the owner, a truck driver, was not home at the time Vick made this confirmation. Detective Vick also told Detective Myers that the names of the occupants of the stolen vehicle were Tracy West, Paul Rathe, and a man named Scott. Detective Vick sent Detective Myers a teletype with the vehicle type and tag numbers on it. Detective Myers then sent out a **"Be on the Lookout"** dispatch notice. Meanwhile, he received a report from a volunteer fireman that a blue Cadillac with Tennessee tags was parked at a local club. The bouncer at the club told the firemen that the men in the blue Cadillac had left with Mr. Babineaux. The police then converged on the Babineaux trailer, where they found and arrested West and Rathe for possession of the stolen vehicle. Under these circumstances, we hold that the police had probable cause to arrest West.*

*¶94. Finally, West contends that his statement should have been suppressed because it was given after the police made promises of leniency. West does not elaborate in his brief on what promises were made, although he testified during the suppression hearing that the officer guarding the door to the room in which he was placed after his arrest told him several times that "it would make things easier on you if you go ahead and make a statement." West also testified that another deputy told him that "it would make it a whole lot easier on y'all if y'all would go -- y'all would get off easier if y'all would go ahead and tell us what happened and stuff," and that as a consequence, he gave the statement because they told him it would be easier on him.*

*¶95. West's co-defendant Rathe corroborated these assertions. He testified during this hearing that, while he was standing in the hall outside the room containing West, he overheard an officer tell West that "everything would be better if we would cooperate." Rathe also testified that he was told that it would be easier on him if he told them everything that happened by Officer Hayden, the same officer who had said the same thing to West.*

*¶96. All of the police officers who testified denied that any such statements were made, and that no deputy guards entered the room where West was being detained to chat with him. Accordingly, the State submits that these promises of leniency never happened.*

*¶97. The trial court denied this motion to suppress from the bench, finding explicitly that the police officers had more persuasive credibility than West and his witnesses. We have held that when a trial court makes factual findings while applying correct legal standards to conflicting evidence, this Court must generally affirm those findings unless they are clearly erroneous.* **Stokes v. State,** *548 So. 2d 118, 122 (Miss. 1989). The trial court's express finding that West and Rathe were incredible witnesses is not clearly erroneous on the record before this Court, and thus its ruling that their statements were not illegally obtained pursuant to promises of leniency is not reversible error.*

*¶98. In summary, there is no merit in West's arguments that his statements to the police and the murder weapon should have been suppressed.*

<i>vi.</i>

*¶99. West also argues that the trial court erred in overruling his objection to the admission of a photograph of the victim's body. He objected below, and presently argues that the photo was gruesome, highly inflammatory, and inaccurate, since the body was flipped over before the photo was taken. In overruling the objection, the trial court found that the photo was not unduly gross or prejudicial, and appeared to be a fair representation of the crime scene. Nonetheless, West argues that the photo was never demonstrated to be relevant to any aspect of the prosecution other than a simple ploy to arouse the passion and prejudice of the jury.*

*¶100. The admission of photographs is within the sound discretion of the trial court, and this Court will reverse only where that discretion has been abused.* **Chase v. State,** *645 So. 2d at 848-49. The photo at issue in this case is indeed rather mild. It shows the victim lying on her back from several feet away. Her head, the site of the wound, is at the far end of the photo, and the wound itself cannot really be seen. There is not much blood. Thus, this photo does not evoke the gruesome predicate of* **McNeal v. State,** *551 So. 2d 151 (Miss. 1989).*

*¶101. Nevertheless, West points out the fact that the State never made any showing that the photo was relevant for any legitimate purpose at all. Defense counsel had moved during the pretrial proceedings to have the photograph suppressed, and the trial court ruled on the objection without asking the State why it wanted to admit the photo. Even if the photo was irrelevant, its admission is not so prejudicial to West so as to require reversal.*

## C. MISCELLANEOUS

<i>i.</i>

*¶102. West contends that the trial court should have declared Mississippi's capital punishment statute unconstitutional. He argues that it is unconstitutional because (1) it allows the death penalty for simple felony murder, but not simple premeditated murder; (2) it fails to provide a principled distinction of death-eligible felony murderers, since the underlying felony is used both to elevate the defendant into the death-eligible class as well as to subsequently aggravate his felony murder*

*conviction; and (3) it places beyond the reach of the sentencing jury the mitigating value of the fact that a felony murderer did not intend to kill the victim.*

*¶103. This assignment of error is without merit. First, any infirmity arising in the statute's capital treatment of felony murderers has not harmed West, since he testified at trial that he was the triggerman and that he intended to shoot and kill Ms. Kiker. Moreover, to the extent that the capital murder statute allows the execution of felony murderers, they must be found to have intended that the killing take place or that lethal force be employed before they can become eligible for the death penalty, pursuant to **Enmund v. Florida,** 458 U.S. 782, 796 (1982). In this case, the jury did find that West killed, attempted to kill, and intended the killing of Ms. Kiker.*

*¶104. West's second argument has been squarely rejected by this Court in **Ballenger v. State,** 667 So. 2d 1242, 1260-61 (Miss. 1995), which noted that where the class is appropriately narrowed through legislative definition of the capital offenses, further narrowing is not required at the weighing stage.*

*¶105. Finally, West's argument that the sentencing jury is unable to consider the fact that a capital defendant did not intend the death of his victim is simply spurious. First, as noted, the jury cannot return a death sentence at all if it cannot conclude that a capital defendant intended the death of his victim. Second, Miss. Code Ann. § 99-10-101(6)(d) treats the fact that a defendant was an accomplice and a minor participant as a mitigating factor, so as to enable the jury to take this factor into account in its weighing process.*

*¶106. Thus, this assignment of error has no merit.*

*ii.*

*¶107. West finally contends that his conviction should be reversed because the trial court committed reversible error in instructing the jury that it could find that West had killed Ms. Kiker with or without deliberate design, when the indictment charged that West had killed Ms. Kiker without any design to effect death. He argues that since this was tantamount to an amendment to the indictment that was material to the merits of the case, the lower court's instruction was reversible error.*

*¶108. This issue arose on the court's initiative, when it offered to instruct the jury that it could find that West killed with or without deliberate design. We hold that this amendment is one of form, not substance. This Court has held that changes of form are permissible. **Griffin v. State,** 584 So. 2d 1274, 1275 (Miss. 1991) (citing **Akins v. State**, 493 So. 2d 1321, 1322 (Miss. 1986)). The language "without any design to effect death" as well as "kill and murder" that appears in the indictment is surplusage, insofar as the capital murder statute under which West was charged, § 97-3-19(2)(e) does not specify whether the killing must be done with deliberate design; any killing will suffice.*

*¶109. That being the case, the amendment was in fact one purely of form. Nothing about the nature of the capital murder charge changed with the addition of "with or without deliberate design" to the original language "without deliberate design." Thus, we hold that there was no error.*

*III.*

*¶110. In conclusion, we hold that West's sentence should be reversed because the trial court refused*

*to instruct his jury during the sentencing phase that it could opt to sentence him to life without parole, and because he instructed the jury that it could find that the killing was heinous, atrocious or cruel when the evidence did not warrant it. In light of our disposition, none of the other issues raised need be reached at this time, as they will not necessarily recur on retrial.*

*¶111. **CONVICTION OF CAPITAL MURDER AFFIRMED; SENTENCE OF DEATH VACATED. REVERSED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.***

***PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., AND MILLS, J., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS, J. WALLER, J., NOT PARTICIPATING.***

***SMITH, JUSTICE, DISSENTING:***

*¶112. Tracy Lee West was convicted of the capital murder of Azra Garriga Kiker which occurred on December 16, 1992. West received the death penalty from the jury. On appeal to this Court, the majority reverses the sentence because the trial court erred in refusing to instruct the jury on three sentencing options, including life imprisonment without eligibility for parole. Additionally, the majority, although claiming not to reverse on the issue of there being insufficient evidence in the record to support the granting of the especially heinous, atrocious, or cruel aggravator, nonetheless in its conclusion, writes that it also reverses for that reason. I disagree and accordingly dissent.*

*¶113. The Legislature amended Miss. Code Ann. § § 97-3-21 and 99-19-101 (Supp. 1994) to allow a sentencing option of life without parole, effective as law on July 1, 1994. West's trial commenced on August 8, 1994, thus the majority reasons that the amendments should apply to his case. However, Miss. Code Ann. § 99-19-1(1972), expressly describes the effect of changes in the law upon the prosecution or punishment of a crime committed prior to the change. The statute reads:*

> *No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes.*

*¶114. It is thus clear that the statute mandates that the punishment prescribed at the time that the crime is committed is what should be considered at sentencing. A subsequent change in the statute regarding punishment is of no effect. See **Byrd v. State**, 165 Miss. 30, 143 So. 852, 853 (1932). There, where the trial court sentenced Byrd for an arson charge to seven years in prison under the statute in effect when the crime was committed, this Court held that a subsequent change in the*

*statute reducing the punishment to no more than five years in prison did not warrant finding the trial court was in error, because the amended statute did not otherwise specially provide that the old statute not continue in operation. **Id.***

*¶115. This Court's more recent case of **Johnston v. State**, 618 So. 2d 90, 94 (Miss. 1993), held that Johnson should be held to the sentence existing on the date of his offense in order to avoid any ex post facto claims. **Id.** Also, in **Hill v. State**, 659 So. 2d 547 (Miss. 1994), this Court, in reviewing the question of retroactive application of statutory amendments under an ex post facto analysis , held that when a substantive right is the subject, the State does not violate the ex post facto principle so long as its subsequent legislation doesn't impede the right. The **Hill** Court, on Petition for Rehearing, (Prather, P.J.), stated: "Application of the 1994 statutory change to the death penalty statute violates Mississippi constitutional provisions against ex post facto law and bars this statute's applicability to Hill." **Hill**, 659 So. 2d at 552 (citing **Johnston v. State**, 618 So. 2d 90, 95 (Miss. 1993)). Additionally this court citing **Dufour v. Hargett**, No. 3:87cv74GR (S.D. Miss. Oct. 3, 1994), slip op. at 8-9, stated "This Court agrees with the finding of that court, and as the final arbiter of Mississippi law, we likewise hold that retroactive application of these changes to the death penalty statute would violate our prohibitions of ex post facto doctrine." **Hill**, 659 So. 2d at 552 n. 2. The Court thus held that Hill was entitled to be sentenced under the statute existing on the date that his <u>offense</u> was committed. I dissented in **Hill**, arguing unsuccessfully that the changes in the 1994 statute were procedural only. The bench and bar is now presented with two inconsistent views of the application of ex post facto to subsequently passed statutes affecting the death penalty. The same view adopted by the Court in **Hill** should also apply in **West**. Obviously, West prefers any sentence other than death. This was a catch-twenty two situation for the trial judge. Here, had the judge instructed the jury that it had the option of returning a verdict of life in prison without benefit of parole, and West sentenced to life without parole, West would now be claiming a violation of ex post facto laws. And, he would be right according to this Court's decision in **Hill**.*

*¶116. Next, the majority claims in its discussion not to be reversing West's sentence of death because of insufficient evidence to support the giving of the "especially heinous, atrocious or cruel" aggravator instruction, but writes of necessity only because it might reoccur at retrial. Then, the majority in conclusion states that it is grounds for reversal. The majority concludes that the proof was insufficient to warrant the aggravator. The basis for the majority's view is that the only evidence was that "she asked West to spare her life while she lay on the floor." Then, the majority states, "[n]othing in our caselaw, however, suggest that this is enough to elevate a murder into an especially heinous, atrocious, or cruel one."*

*¶117. I must respectfully disagree. In **Underwood v. State**, 708 So. 2d 18 (Miss. 1998), where this same aggravator concerning mental torture was given to the jury, this Court held that the length of victim's consciousness after she received gunshot wounds was irrelevant, where she was kidnapped, made to walk on nerve-damaged feet while leaving her to ponder her execution, ordered to kneel before him, and defendant fired four shots into victim's body. The victim was found with grass clutched in her hands. Mental torture was clearly proper in granting the aggravator. See also **Woodward v. State**, No. 95-DP-00144-SCT, 1997, WL 776557, (Miss. Dec. 18, 1997) (where victim suffered mental torture and aggravation before death). In contrast, this Court, in **Lockett v. State**, 517 So. 2d 1317 (Miss. 1987), affirmed the granting of the aggravator where the same aggravator was given, the victim was shot once, after which defendant fired an additional "four to five rounds,"*

*and there was no evidence to indicate that victim was dead or unconscious when latter shots were fired. Subsequently, in **Lockett v. Puckett**, 980 F. Supp. 201 (S.D. Miss.1997) , the federal district court held that the defendant was entitled to habeas relief on death sentence for husband's murder based on absence of factual findings to support especially heinous aggravating factor in murder involving quick death with little or no warning to victim. **Id.** at 228-29. The Court found that in reversing, this Court had failed to make any factual findings concerning the death of murder victim and failed to set forth any facts on which to base such an opinion. Thus, in **Lockett**, there was no warning to the victim and death was instant.*

*¶118. In the case at bar there is clearly prior warning to the victim that she was about to be killed. She recognized that fact, because she was pleading for her life. West had ordered the victim to lie on the floor and was attempting to shoot her in the back. He had extreme difficulty getting the gun to ever fire in the first place. He finally got it to fire, then couldn't get the spent hull to eject. He cocked it, pulled the trigger and the gun misfired. All the while, lying prostrate on the floor, "obviously pondering her imminent execution," the victim was pleading for her life. This entire scene was certainly not something that took place instantly as in **Lockett**, but rather occurred over a prior of time as in **Woodward** and **Underwood**. The majority reasons that "there is no evidence that Ms. Kiker heard the gun misfire, or that there was any considerable length of time between the misfire and the shot that killed her." As this Court stated in **Underwood**, "[t]he measure of Underwood's lack of conscience and pity is the extent of pain and suffering that Mrs. Harris felt." **Id.** at 39. The same is true of West. How in good conscience can the majority not say that these barbarous facts are not sufficient to satisfy the aggravator that West inflicted physical and/or mental torture and pain upon the victim before she died. I find it absolutely astounding that the majority could suggest that a victim placed prostrate on the floor during an armed robbery does not realize when the robber pulls a gun and points it at her, that she, obviously aware of impending death as she is pleading for her life, when he subsequently starts pulling the trigger, that the victim would not hear "the sound of the cold hard steel hammer falling upon a firing pin." If anything, under this factual situation the sound of metal on metal would be significantly heightened to a person facing imminent death If this fact alone doesn't create mental torture, what on God's earth ever could. Here, this Court's majority is simply splitting fine hairs. I would affirm.*

*¶119. I respectfully dissent.*

**ROBERTS, J., JOINS THIS OPINION.**

*1. This Court has recently held that this same effective date provision cannot be interpreted to apply the truth-in-sentencing amendments, Senate Bill 2175, to prisoners whose crimes occurred prior to July 1, 1995, since to do so would violate the constitutional prohibitions against ex post facto law. **Puckett v. Abels, et al,** 684 So. 2d 681(1996). The distinction between that provision and the one at issue in this case is that the truth-in-sentencing provision is not even arguably ameliorative; no competent person would ever opt to be required to serve 85% of his prison term if he had the option of having to serve less time.*

*2. The trial was ultimately continued until after July 1, 1994, although obviously not for the purpose of bringing West's proceeding within the purview of the statute.*

*3. Moreover, West waived his ex post facto claims in the very act of requesting that the amendment be applied to him, as well as the act of submitting several jury instructions to the court which invited the jury to return a sentence of life without parole, since a defendant cannot ordinarily appeal any error that he introduced. See, e.g.,* **Carr v. State**, *655 So. 2d 824 (Miss. 1995) (holding that appellant had waived any objection to an instruction that he had himself introduced, and which was amended by the State without objection from appellant).*

*4. The state's assertion of the pertinence of this statute seems to concede that the amended version of § 99-3-21 (providing for life without parole) is in fact ameliorative; § 99-19-33 is only operative where the amended statute provides a punishment of a "milder type."*

*5. Even if the trial court had any discretion in applying amended sentencing schemes, such discretion is inappropriate in capital cases. The United States Supreme Court as well as this Court have both held that the specter of the death penalty commands a more stringent degree of consistency in capital proceedings.* **Eddings v. Oklahoma,** *455 U.S. 104, 111-12 (1982) (capital punishment must be imposed with consistency or not at all);* **King v. State,** *656 So. 2d 1168, 1173 (Miss. 1995) (stating that since a statutory amendment which gave appellate court the power to apply harmless error analysis to an erroneously submitted aggravating circumstance had not been applied to other capital defendants who were similarly situated, consistency in the application of the death penalty compelled the same approach to King). As already noted, several capital defendants whose crimes and even convictions occurred prior to the amendment providing the sentencing option of life without parole have received the benefit of the amendment. The fact that West's trial judge exercised discretion otherwise rather alarms these principles, which forbid arbitrary and capricious death sentencing.*

*Indeed, our issuance of a mandamus to the trial court in the* **Woodward** *case accords with these principles, that a capital defendant may not be arbitrarily denied the benefit of the amendment when he had waived any claim of error in their application.* **Woodward v. State,** *No. 95-M-00144 (Order issuing writ of mandamus, September 11, 1995).*

*6. This Court has recognized duress as a defense to robbery, although not to homicide.* **Wilson v. State,** *390 So. 2d 575, 576 n.1 (Miss. 1980).*

*7. This Court has not enunciated the precise elements of a duress defense, however the Fifth Circuit has prescribed the following components: (1) the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in the situation; (3) that he had no reasonable legal alternative to violating the law; (4) that a direct causal relationship may be reasonably anticipated between the criminal action and the avoidance of harm.* **United States v. Harper,** *802 F.2d 115, 117 (5th Cir. 1986).*

*8. Similarly, West contends that the trial court erred in refusing to instruct the jury that it should consider West's subjective sense of fear, coercion, or duress in assessing whether he had specifically intended to commit the robbery. We have already held that no rational juror in this case could have*

*concluded that, in spite of West's testimony that he intended to shoot and rob the victim, he did not have the specific intent to do so. Thus, West was not entitled to any subjective fear instruction that would invite a jury to find that he could not have the requisite specific intent.*