643 So.2d 501 (1994)
John Mark FERRILL and Roxanne Elizabeth Ferrill
v.
STATE of Mississippi.
No. 91-KA-00767.
Supreme Court of Mississippi.
September 22, 1994.
Jimmy D. McGuire, Gulfport, for appellants.
Michael C. Moore, Atty. Gen., Wayne Snuggs, Asst. Atty. Gen., Jackson, Ellen Y. Dale, Ridgeland, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.
DAN M. LEE, Presiding Justice, for the Court:
The appellants, John Mark Ferrill and Roxanne Elizabeth Ferrill, were convicted on July 19, 1991, in the Hancock County Circuit Court for violating Miss. Code Ann. § 41-29-139 (1972). We reverse, finding that the lower court failed to properly instruct the jury regarding the inconsistent testimony of an accomplice.

I.
John Mark Ferrill ("Mark") and Roxanne Elizabeth Ferrill ("Roxanne") were arrested on April 7, 1990, as the result of Larry Wall's cooperation with narcotics agents in arranging a "buy" of 1700 grams (3.6 lbs.) of marijuana. Although Mark and Roxanne were not physically present at the time that the drugs were exchanged for money, they were later arrested and indicted along with James Thomas Nobles, a/k/a Cuz, the person who delivered the marijuana to Larry Wall.
The three were indicted under Miss. Code Ann. § 41-29-139(a)(1) (1972). That indictment charged that Mark, Roxanne, and James Thomas Nobles "did knowingly, wilfully, unlawfully and feloniously, sell or transfer more than one kilogram of Marijuana, a Schedule I Controlled Substance, to Larry Wall...." Arraignment was waived by Mark and R, and both entered pleas of "not guilty." James Thomas Nobles ("Cuz") also waived arraignment and entered a plea of "not guilty;" however, three (3) days before the trial in the case sub judice, Cuz changed his plea to "guilty" and later testified against *502 Mark and Roxanne as a witness for the State.
At the conclusion of the defendants' case-in-chief, proposed jury instructions were submitted for the lower court's approval. But, several of the defendants' proposed jury instructions, including an "impeachment instruction" and an "accomplice cautionary instruction," were denied by the lower court judge over objections by defense counsel.
The jury instructions were read to the jury and immediately thereafter the jury deliberated to consider their verdict. Over three hours later the jury returned to the courtroom, having unanimously decided on a "guilty" verdict. Subsequently, the lower court judge ordered Mark and Roxanne to each: 1) serve twenty (20) years in MDOC (five years suspended, fifteen years to serve); and 2) pay a $20,000.00 fine.
Aggrieved, Mark and Roxanne appealed to this Court. Two of the issues presented by Mark and Roxanne warrant discussion. Those issues are stated as follows:
THE TRIAL COURT ERRED IN REFUSING DEFENSE INSTRUCTION A-7, A TESTIMONY IMPEACHMENT INSTRUCTION.
THE TRIAL COURT ERRED IN DENYING INSTRUCTION A-19 FOR THE DEFENDANTS, AN ACCOMPLICE CAUTIONARY INSTRUCTION.

II.

A.
The investigation of Mark and Roxanne evolved out of a Narcotics Task Force ("NTF") surveillance of another person, Larry Wall ("Wall"), a/k/a Donny Wall, on April 6, 1990. On that day, two NTF agents had followed Wall to New Orleans, Louisiana, where he purchased a pound of marijuana. Next, the agents followed Wall from New Orleans back to Hancock County, Mississippi, where NTF agents stopped Wall's vehicle, presented a search warrant, and obtained a pound of marijuana from the trunk of Wall's vehicle.
Wall told the NTF agents that he was willing to cooperate with them if they would get him out of the public's view so that "nobody would see [him] and know that [he] had been busted  arrested." Wall was transported to the NTF headquarters location, and, as a means of "cutting a deal," Wall told the NTF agents that he could purchase a large quantity of marijuana.
According to the testimony of NTF agents, Wall was desperate to cooperate with the police by setting someone up. One NTF agent also testified that Wall's brother and sister-in-law were both in trouble with the law, and Wall was trying to "work out a deal" for himself, as well as his brother and sister-in-law.
As a consequence, Wall represented that Mark and Roxanne were the people from whom he could make a large drug purchase and that their telephone number was 832-9007. The telephone number was verified by the NTF agents as listed to Mark and Roxanne, and the NTF agents set up a recorder on a telephone at their office in order to record conversations between Wall and the Ferrills. From there, two telephone conversations were recorded between Wall and the parties who answered the dialed telephone number, allegedly Mark and Roxanne.
The first telephone conversation was recorded on April 6, 1990, and the second recording was made the following morning, April 7, 1990, at 10:50 a.m. A third telephone conversation was initiated and recorded by NTF agents from Wall's residence at 11:40 a.m. on April 7, 1990. The substance of all three telephone conversations was the culmination of an agreement for the purchase, sale, and delivery of approximately four (4) pounds of marijuana.
In preparation for Wall's receipt of the marijuana, the NTF agents placed a body wire (transmitting microphone) on Wall and gave him money for the drug buy. Afterwards, Wall waited outside the front of his trailer for the drug delivery. Cuz arrived shortly thereafter, and while exchanging 1700 grams (3.6 lbs.) of marijuana for Wall's money, Cuz was arrested by the NTF agents.
Cuz had delivered the marijuana to Wall in plastic ziplock bags. However, when questioned *503 at trial, one of the NTF agents admitted that the marijuana-filled plastic bags were not dusted for the fingerprints of Mark or Roxanne; therefore, there was no physical evidence linking Mark and Roxanne to the bags of marijuana.

B.
At the trial of Mark and Roxanne, Wall testified as a witness for the State. According to his testimony, he had known Mark and Roxanne for about one and one-half (1-1/2) years, and he had spoken to Mark on the telephone about 50 times, while he had spoken to Roxanne on the telephone 20-25 times. One of the tapes was played for the jury, and Wall testified that he recognized the voices on the tape; that it was his voice and Mark's voice. Another tape was played thereafter. Wall identified the voices on the second tape as his and Roxanne's. The tape of the third recorded telephone conversation was played and Wall stated that he also recognized those voices as his and Roxanne's voices. Wall testified that the third tape-recording represented a telephone call placed from his house for the purpose of notifying Mark and Roxanne that he wanted to buy four (4) pounds of marijuana, that he had the money, and that they should deliver the marijuana to his house.
On cross-examination, Wall confirmed that, at the time of the trial, his brother, Richard Wall, and his sister-in-law, Hilary Wall, were both in trouble with the law concerning drug offenses.

C.
Cuz also testified for the State. Other than the taped conversations with Wall, his testimony is all that linked Mark and Roxanne to the drug transaction. However, his testimony was tainted because of a contradictory pre-trial statement which he had earlier given under oath.
According to Cuz's testimony, he had known Mark and Roxanne for 11-12 years. He stated that, on April 7, 1990, he was at Mark and Roxanne's house; that on the morning of April 7, Mark asked him to transport four (4) pounds of marijuana from the Ferrill's house to Wall's house and to sell it to Wall for $875.00 per pound. He stated that, prior to Mark's request, a telephone call had been received at the Ferrill's house, and he overheard Roxanne say that "he wanted four of them and Mark said, `all right, I got them ready.'"
When asked about it on cross-examination, Cuz responded that he remembered making a prior inconsistent statement in the defense counsel's office while under oath. He did not deny making the prior inconsistent statement, responding to the question at trial as follows:
Q. Did you make the following statement:
"That I am freely making  that I am making this statement freely, voluntarily and without threats, promises, coercions, promises of reward or out of fear for my safety. That I neither received marijuana from John Mark Ferrill or Roxanne Elizabeth Ferrill on the 6th or 7th day of April, 1990, or at any time before or after that date nor did I see them on the above mentioned dates. To my knowledge they have no involvement whatsoever with the case for which I am charged."

Did you sign an affidavit under oath to that effect?
A. Yes, sir, I did.
(emphasis added).
On redirect, Cuz testified that he made the aforementioned statement because he was confused at the time and didn't know what to do. He claimed that he was nervous and confused.

D.
The defense presented several witnesses who testified that the voices heard on the tape-recordings were not those of either Mark or Roxanne. Mark's grandfather stated that he had heard Mark's voice on the telephone many times, as well as Roxanne's voice. He testified that he had previously listened to the tape-recorded conversations while they were replayed at the sheriff's department. Although he stated that the voices on the tapes were not those of Mark and Roxanne, he recognized two voices on *504 the tapes as being voices of Richard Wall and Hilary Wall. Further, according to Mark's grandfather, at the time that the tapes were played at the sheriff's department, Cuz was also there, and Cuz indicated that he recognized the voices on the tapes as those of Richard Wall, Hilary Wall, and Larry Wall, but not Mark or Roxanne Ferrill.
Roxanne's mother also testified. Of apparent importance to the defense, she stated that her telephone number was not the same as the telephone number of Mark and Roxanne. Her telephone number was "not" 832-9007, it was 868-3909. She testified that Mark and Roxanne stayed at her house on the night of April 6, 1990, and once Mark and Roxanne arrived on April 6, they did not leave her house for any appreciable period of time until the following morning, April 7, 1990, when they left at approximately 10:00-10:15 a.m.
According to Roxanne's mother, she also listened to the tape-recorded conversations. She testified that, although she did not recognize the voices on the tapes, the voices were not those of Mark or Roxanne.
Mark testified in his own defense. He stated that, while at Roxanne's mother's house on the night of April 6, 1990, he and Roxanne received several telephone calls. But, every instance that they reached the phone, the person on the other end of the telephone had terminated the call. Also, according to Mark, he did not talk to Wall on April 6, 1990, and he never sent Cuz to Wall's house; Cuz's testimony to the contrary was not true.
Although he admitted that his telephone number was 832-9007, Mark denied ever receiving the three telephone calls placed to 832-9007 which were recorded by the NTF agents. Instead, Mark stated that, on April 6, 1990, his phone had a call-forwarding feature, insinuating that, even if his telephone number were dialed, it could be directed to another address. He further testified that it was not his voice in the recorded conversations, but the voices on the tapes were those of Hilary Wall, Richard Wall, and Larry Wall.
Roxanne testified, supporting Mark's proposition that, even though the NTF agents dialed 832-9007 (Roxanne and Mark's telephone number), the call-forwarding feature could have been utilized in a manner so as to re-direct those calls to someone else who answered and spoke with Wall. Her testimony suggested a plot on the part of Wall, his brother, Richard Wall, and his sister-in-law, Hilary Wall, which was intended to implicate Mark and Roxanne while allowing the Walls to benefit from the "deal" which Larry Wall had made with the NTF agents.
Roxanne indirectly suggested that Hilary Wall, a person she knew from earlier years, had tampered with Mark and Roxanne's telephone on April 6, 1990, when Hilary used the telephone at their house. Although Hilary Wall had never been to their house on a prior occasion, on April 6, 1990, she drove into Mark and Roxanne's driveway, went to the door, and asked Roxanne if she could use the telephone to call her husband because she was having car trouble. Roxanne was on her way out; nevertheless, before she left, Roxanne showed Hilary to the telephone. Because she was running late, as she exited the house, Roxanne asked Hilary to close and lock the door behind her.

III.

THE TRIAL COURT ERRED IN REFUSING DEFENSE INSTRUCTION A-7, A TESTIMONY IMPEACHMENT INSTRUCTION.
The proposed instruction at issue which was denied by the lower court judge was basically an "impeachment" instruction. It reads as follows:
JURY INSTRUCTION NO. A-7
The Court instructs the jury that the testimony of a witness may be discredited or impeached by showing that on a prior occasion they have made a statement which is inconsistent [sic] or contradictory statement must involve a matter which is material to the issues in this case.
A prior statement of the witness or witnesses can be considered by you only for the purpose of determining the weight or *505 believeability [sic] that you give to the testimony of the witness or witnesses that made them. You may not consider the prior statements as proving the guilt or innocence of the accused.
The Ferrills argue that Cuz was a key witness and that his testimony at trial was impeached by his prior inconsistent sworn statement in which he reported that the Ferrills had no involvement with the drug transaction. As such, they assert that an impeachment instruction was warranted and the lower court erred in refusing the proposed instruction. We agree.
In a recent case before this Court, McGee v. State, 608 So.2d 1129 (Miss. 1992), we held that the lower court erred in refusing to grant a proposed jury instruction. That instruction contained language concerning the credibility of impeached witnesses which is nearly identical to the language of proposed instruction A-7 in the case sub judice. In McGee, the defense characterized prior statements of a prosecution witness as inconsistent with the trial testimony. Accordingly, on appeal, the defendant/appellant argued that the trial judge should have submitted an impeachment instruction to the jury which he proffered at trial. That proposed instruction stated that:
The testimony of a witness or witnesses may be discredited or impeached by showing that on a prior occasion they have made a statement which is consistent with or contradictory to their testimony in this case. In order to have this effect, the inconsistent or contradictory prior statement must involve a matter which is material to the issues in this case.
[T]he prior statement of the witness or witnesses can be considered by you only for the purpose of determining the weight or believability that you give to the testimony of the witness or witnesses that made them. You may not consider the prior statement as proving the guilt or innocence of the defendant.
Id. at 1134.
As is readily apparent, there is little difference between the language of the proposed instruction in the case sub judice, and the language of the instruction which this Court held as error for the lower court to refuse to submit to the jury in McGee.
Regardless, even without the precedential authority of McGee, the facts of the case sub judice warrant submission of the impeachment instruction to the jury. The prior inconsistent statement was read to Cuz while he was on the witness stand, and he admitted making the statement under oath. That prior statement was directly contradictory to his testimony at trial, and Cuz's trial testimony was significant to the prosecution's case.
Consequently, the jury should have been instructed that Cuz's testimony could be impeached by a prior inconsistent statement and that such a statement could be considered by the jury in determining the credibility or believability of Cuz's testimony. Therefore, the lower court's denial of proposed instruction A-7 had the effect of prejudicing the defense.
In McGee, we discussed the standard which the trial court should follow when confronting the issue of the propriety of refusing a proffered jury instruction, stating that:
In Hill v. Dunaway, 487 So.2d 807 (Miss. 1986), this Court held:
The refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper, only if the trial court  and this Court on appeal  can say, taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find the facts in accordance with the theory of the requested instruction.
McGee v. State, 608 So.2d 1129, 1134 (Miss. 1992) (emphasis added  citation omitted). Cf. Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964).
Other than Cuz's trial testimony, there was little concrete evidence which indicated that Mark or Roxanne asked Cuz to act as a courier and to sell the marijuana to Wall. Therefore, taking the evidence in the *506 light most favorable to Mark and Roxanne, and considering all reasonable favorable inferences which may be drawn in their favor, we cannot say that a hypothetical, reasonable jury could not find the facts as suggested by the defense in the jury instruction at issue  that Cuz's trial testimony was not believable, and his prior sworn statement exculpating Mark and Roxanne was true.
If the jury had been properly instructed regarding the discrediting or impeachment of Cuz's testimony at trial, they may have chosen to give little weight to that testimony or disbelieve it altogether. As a consequence, we are compelled to conclude that it was improper for the lower court to refuse proposed impeachment instruction A-7.

IV.

THE TRIAL COURT ERRED IN DENYING INSTRUCTION A-19 FOR THE DEFENDANTS, AN ACCOMPLICE CAUTIONARY INSTRUCTION.
The facts of the case sub judice make resolution of this issue troublesome. Standing alone, we cannot say that this issue would be resolved one way or the other. However, the combination of Cuz's status as an accomplice with his contradictory sworn statement and trial testimony make it difficult to view this issue in isolation. Here, we are faced with a witness who was an accomplice and who have a prior inconsistent statement which could be used to impeach the credibility of his trial testimony. Were it not for the reversible error in the lower court's failure to give the impeachment instruction, supra, it would be necessary for us to decide whether this issue, standing alone, warranted reversal of the case sub judice. But, since resolution of this issue is not necessary for disposition of the case sub judice, we decline to do so. Nevertheless, a review of this issue is beneficial to our jurisprudence.
The Ferrills characterize both Cuz and Wall as co-conspirators/accomplices and contend that instruction A-19 would have assisted the jury in weighing the evidence submitted in the case, especially since the only testimony linking them to the charged crime consisted of that of Wall and Cuz. Accordingly, Mark and Roxanne argue that proposed jury instruction A-19, an "accomplice cautionary instruction," should have been submitted to the jury. The proposed jury instruction stated as follows:
JURY INSTRUCTION A-19
The Court instructs the Jury that the testimony of the alleged accomplices, Larry V. Wall a/k/a Donnie Wall and James Thomas Nobles, should be weighed with great caution and the Jury may disbelieve their testimony altogether if they believe it untrue, the Jury being the sole judges of the credibility of the witnesses.
Although proposed instruction A-19 was refused by the lower court judge, the last portion of that proposed instruction, regarding the jury as the judge of the credibility of witnesses, was duplicated in instruction C.1, which was given to the jury. Instruction C.1 stated, inter alia, as follows:
INSTRUCTION C.1
As sole judges of the facts in this case, your exclusive province is to determine what weight and credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.
Since the jury was generally instructed on the issue of weight and credibility of all the witnesses, the pertinent question becomes whether distinct and separate language cautioning the jury about the testimony of co-conspirators/accomplices should be given upon the request of a defendant. We answered that question in a prior case before this Court, Derden v. State, 522 So.2d 752 (Miss. 1988). There, we said that:
As a general rule a trial judge should not hesitate to grant the cautionary instruction when the State is relying upon the testimony of co-conspirators.
In Van Buren v. State, 498 So.2d 1224, 1229 (Miss. 1986), this Court said, "the granting of a cautionary instruction regarding *507 the testimony of an accomplice is discretionary with the trial judge." However, that discretion is not absolute; it may be abused. Two aspects in determining whether or not the discretion has been abused are (1) was the witness in fact an accomplice, and (2) was the testimony without corroboration.

Derden v. State, 522 So.2d 752, 754 (Miss. 1988) (emphasis added  citations omitted).
In another case in which we addressed the issue of cautionary instructions, we reiterated our prior holdings, stating:
Where the state's evidence rests solely upon the testimony of an accomplice witness, this Court has said that the trial court errs in failing to give a cautionary instruction. Additionally, the Court has found abuse of discretion where there is some question as to the reasonableness and consistency of the testimony of the accomplice or the defendant's guilt is not clearly proven.
... [T]his Court delineated a two-part test to determine whether a trial judge abused his discretion. First, was the witness an accomplice, and secondly, was his testimony without corroboration.
An accomplice for these purposes is a person who is implicated in the commission of the crime. That is to say, that if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator the cautionary instruction should be given.
The remaining question is whether there is sufficient corroboration to excuse the failure to give the instruction. On close examination, this is but another way of inquiring whether the failure to grant the instruction is harmless.
Burke v. State, 576 So.2d 1239, 1242 (Miss. 1991) (emphasis added  citations omitted).
The State concedes that Cuz was an accomplice, however, the same is not conceded with regard to Wall's status. Nevertheless, Cuz's status as an accomplice satisfies the threshold requirement; therefore, the remaining sub-issues are: 1) whether the State's evidence rested solely upon the testimony of Cuz or, if not, whether Cuz's testimony was reasonable and consistent; and 2) whether Cuz's testimony was corroborated.
Cuz's testimony was not the only evidence implicating the Ferrills. However, important to our discussion here, his testimony was inconsistent with his prior sworn statement and it was virtually the only concrete evidence which established the fact that Mark instructed Cuz to deliver and sell the marijuana to Wall  a crucial feature of the prosecution's case. Therefore, Cuz's testimony constituted weighty evidence which implicated the Ferrills, but it was inconsistent with his prior sworn statement which was read to the jury and introduced as evidence at the trial.
Regarding the sub-issue of corroboration, the tape-recordings could be viewed as supportive of Cuz's trial testimony. But, in light of Cuz's pre-trial affidavit which was given under oath, resting on the tape-recordings as support for his subsequent diametrically opposed trial testimony is "skating on thin ice."

V.
Cuz, an accomplice, gave a sworn pre-trial statement which was memorialized in affidavit form. That affidavit contained exculpatory statements pertaining to the defendants in the case sub judice, Mark and Roxanne. Nevertheless, at trial, Cuz, the accomplice, testified to the contrary, implicating the defendants, and it is evidence from the record that the prosecution's case relied heavily upon the trial testimony of that accomplice.
Consequently, the lower court erred by refusing to give the jury the proffered "impeachment instruction" regarding the testimony of Cuz. Accordingly, the judgment of the lower court is reversed and the case is remanded for a new trial.
REVERSED AND REMANDED TO THE HANCOCK COUNTY CIRCUIT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and BANKS, JJ., concur.
*508 SMITH, J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
McRAE, J., dissents as the court should not be in the business of giving advisory opinion and C-1 instruction adequately covers the A-7 instruction.
SMITH, Justice, dissenting:
The idea that the Ferrills were entitled to an "impeachment instruction" or an "accomplice cautionary instruction" is based on several false ideas.
Regarding Jury Instruction A-7, the Ferrills' single cited case is not on point; yet, the majority furnishes the Ferrills with their authority, McGee v. State, 608 So.2d 1129 (Miss. 1992), and based thereon the majority would reverse and remand this case. The Ferrills did not cite any supporting authority because at the time the lower court made its decision and filed their appeal the statutory and caselaw was contrary to their position. The case relied on by the majority did not exist.
The decision in McGee was made apparently without reference to previous decisions of this Court. Trying to discover the origins of the McGee decision leads to a dead end. It has no known parentage or relatives. It is a true orphan.
McGee flies in the face of a long history of caselaw based on sound reasoning. If it was the intent of the Court to abandon prior law it should have said so and explained why the proposed instruction is no longer a comment on the evidence and why all these prior cases should be overruled.
Ignoring longstanding established precedential cases, the McGee Court held that the failure to give an "impeachment" instruction almost identical to A-7 in the case at bar was reversible error. McGee was not decided until one month after the briefs were filed in the case sub judice.
In discussing Instruction A-19, the Ferrills refer to Walls and Nobles as accomplices. "Cuz" Nobles clearly was an accomplice, but not Walls who was the confidential informant who cooperated with and assisted the law enforcement officers in this case. A cautionary instruction such as A-19 is discretionary with the trial court and strictly applies only to accomplice testimony when that testimony is uncorroborated. The State's case did not rest solely upon either Walls' or Nobles' testimony. Their testimony was corroborated by the tape recordings of the Ferrills and the testimony of three law enforcement officers.
Because I do not share the majority opinion regarding the two jury instructions at issue, I am compelled to dissent.
The majority bases its decision to reverse and remand primarily on the failure to grant the "impeachment instruction." The majority holds that the trial court should have granted Instruction A-7 concerning the attempted impeachment of "Cuz" Nobles. The trial court had ruled that the proposed instruction was an improper comment on the testimony of one witness, therefore singling such testimony out and giving it more attention.
The Ferrills, in support of their argument, cite Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964), as their sole authority. However, Hall is not on point, as that case stands only for the proposition of determining how and under what circumstances a witness could be impeached with a prior inconsistent statement. Because the Ferrills fail to cite relevant authority, this Court should decline to address this issue. This Court, in Smith v. Dorsey, 599 So.2d 529, 532 (Miss. 1992), declined to assess issues on the merits that the appellants failed to address, failed to devote any discussion or attention to in their brief and failed to cite authority therefor. See also, R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss. 1990); Brown v. State, 534 So.2d 1019, 1023 (Miss. 1988); Shive v. State, 507 So.2d 898 (Miss. 1987); Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916 (Miss. 1987); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Pate v. State, 419 So.2d 1324 (Miss. 1982).
Also, the Hall Court did not consider whether the legal principles involved should be explained to the jury by using a jury instruction. This Court has discussed the danger as well as this Court's aversion to the practice of taking language from a judicial *509 opinion regarding a certain point of law and submitting it to a jury as an instruction. See, Knight v. State, 215 Miss. 251, 60 So.2d 638 (Miss. 1952); Wood v. State, 197 Miss. 657, 20 So.2d 661 (Miss. 1945).
More importantly, this Court in Foster v. State, 508 So.2d 1111 (Miss. 1987), a death penalty case involving obvious heightened scrutiny, held that an instruction virtually identical to the instruction offered by the Ferrills in the case sub judice was properly refused because it constituted an improper comment on the evidence. Id. at 1119. See also, Stewart v. State, 355 So.2d 94 (Miss. 1978).
In Dolan v. State, 195 Miss. 154, 13 So.2d 925 (1943), the jurors were instructed that if they believed that any witness had sworn falsely to any material fact, they could disregard the testimony of that witness altogether, this Court held that:
The first instruction is clearly erroneous as being a comment upon the weight of the evidence and the credibility of witnesses and falls under the condemnation heretofore visited upon the so-called principle of "falsus in uno". Metropolitan Life Insurance Company v. Wright, 190 Miss. 53, 199 So. 289; Columbus & G. Ry. Co. v. Robinson, 189 Miss. 675, 198 So. 749; M. & A. Motor Freight Lines v. Villere, 190 Miss. 848, 1 So.2d 788.
Id. 13 So.2d at 925.
The majority relies on the recent case of McGee v. State, 608 So.2d 1129 (Miss. 1992) for their authority to reverse the trial court for failure to give this type instruction. McGee was not decided until one month after the case sub judice was briefed. The McGee Court reversed and remanded for failure to give a virtually identically worded impeachment instruction as that disallowed by this Court in Foster as well as the same one refused by the trial judge in the case at bar. The McGee court failed to address Foster or any other precedent on this subject matter.
The majority fails to consider the second prong of the Holmes criteria; that the requirement for an "accomplice" instruction like A-19 only comes about when the State's case rests entirely upon the uncorroborated testimony of an accomplice. We do not have such a factual situation in the case at bar. Considering the testimony of Walls, three law enforcement officers and the tape recordings of the Ferrills, there is more than sufficient corroborating evidence in addition to the testimony of the accomplice "Cuz" Nobles to warrant the verdict of the jury. The trial court did not abuse its discretion.
Jury Instruction A-19, commonly referred to as an "accomplice" instruction, refers to both Wall and Nobles as accomplices. This Court has consistently stated its' position with regard to granting such instructions, to-wit:
[T]he granting of a cautionary instruction regarding the testimony of an accomplice witness is discretionary with the trial court. Wheeler v. State, 560 So.2d 171, 172 (Miss. 1990); Derden v. State, 522 So.2d 752, 754 (Miss. 1988); Van Buren v. State, 498 So.2d 1224, 1229 (Miss. 1986) and Holmes v. State, 481 So.2d 319, 322 (Miss. 1985).
Burke v. State, 576 So.2d 1239, 1242 (Miss. 1991). See also, Hussey v. State, 473 So.2d 478 (Miss. 1985); Davis v. State, 472 So.2d 428 (Miss. 1985) and Jones v. State, 381 So.2d 983, cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (Miss. 1980).
This Court, in Green v. State, 456 So.2d 757, 758 (Miss. 1984) in deciding that the trial court had not abused its discretion in refusing to grant an accomplice instruction, held:
Assuming Williams was an accomplice to the crime as contended by the defendant, this Court has held on numerous occasions that the trial court has broad discretion in deciding whether to grant a cautionary instruction regarding the testimony of an accomplice; and, the refusal to give such an instruction does not constitute reversal error. Fleming v. State, 319 So.2d 223 (Miss. 1975); Wilson v. State, 305 So.2d 347 (Miss. 1974); Robinson v. State, 219 So.2d 916 (Miss. 1969). However, that discretion is subject to abuse when the State's evidence rests solely upon the testimony of an accomplice and there is some question as to the reasonableness and consistency of the testimony, or the defendant's guilt is *510 not clearly proven as was the case in Catchings v. State, 394 So.2d 869 (Miss. 1981).
However, the Court's rule involving the trial court's discretion in "accomplice" instructions is not absolute. This Court has stated that when the State's case rests entirely on the testimony of an accomplice, the trial court should grant a cautionary instruction as to the accomplice's testimony. This Court in Holmes v. State, 481 So.2d 319 (Miss. 1985), adopted a two-part test to determine whether a trial court had abused its discretion in refusing to grant an accomplice instruction. That test is (1) whether the witness actually is an accomplice and (2) whether the testimony is uncorroborated.
We first examine the issue of whether the two witnesses are accomplices. The State concedes that Nobles was an accomplice. However, Walls was merely a cooperating, confidential source. Because of the Ferrills' inability to prevail on the second prong of the Holmes test, it is unnecessary to decide whether Wall was an accomplice.
Regarding this second prong, the question, which apparently escaped the majority, is whether the State's case rested solely on the testimony of Nobles and/or Walls. Officer Gus Aime of the Bay St. Louis Police Department and Sheriff Glen Strong of Hancock County both testified they were present when Wall made the three taped telephone calls. This testimony was also corroborated by Officer James Varnell of the Waveland Police Department. They also saw "Cuz" Nobles arrive at the prearranged place and attempt to deliver marijuana to Wall. There was also the physical evidence consisting of the three taped phone calls between Walls, Mark and Roxanne. In the taped phone conversations, "Roxanne" discussed the sale of three pounds and yelled to a "Mark" about the price. She concluded the last phone call by saying they would send "Cuz" over with the marijuana. "Cuz" arrived with the marijuana shortly after the last phone conversation. Also, the jury heard a tape recording of the actual attempted transaction of the marijuana sale between "Cuz" and Walls.
Clearly the State presented ample evidence to corroborate the testimony of both Wall and Nobles and thus satisfy the second prong of the test required by this Court. The corroborating testimony of three law enforcement officers along with the tape recordings was more than sufficient evidence. The jury chose to believe that "Mark and Roxanne" on the tape recordings were the Ferrills rather than Wall's brother, Richard Wall and his wife Hillary Wall, as represented to the jury by the Ferrills and their witnesses. A cautionary accomplice instruction was not required in the case at bar. The trial judge properly utilized his discretion in deciding not to allow the instruction. The majority's position on this instruction is not clear, but there was no error in refusing to grant this instruction and no reason to discuss it further in light of the existing caselaw.
Neither was the trial court in error for refusing the "impeachment" Jury Instruction A-7, as the instruction clearly constituted an improper comment on the evidence. The verdict of the jury should be affirmed.
I respectfully dissent.
JAMES L. ROBERTS, Jr., J., joins this opinion.