# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-01238-SCT

*RONNIE LEE SWANN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/20/1999 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | ITAWAMBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN DAVID WEDDLE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY:BILLY L. GORE |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/07/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/28/2002 |

### BEFORE SMITH, P.J., COBB AND DIAZ, JJ.

### DIAZ, JUSTICE, FOR THE COURT:

¶1. This is a criminal appeal from a conviction of capital murder in the Circuit Court of Itawamba County, Mississippi, Judge Thomas J. Gardner, III, presiding. At the conclusion of a six-day bifurcated trial by jury conducted March 15-20, 1999, Ronnie Lee Swann was convicted of capital murder and sentenced by the jury to serve a term of life imprisonment without the benefit of probation or parole.

¶2. John Edward Seal, a fifty year old resident of Tupelo, disappeared in Lee County on February 7, 1986, while on his way home from the Veteran's Administration Hospital in Memphis. In January of 1998, following a tip from an anonymous citizen informant, Seal's clothing and skeletal remains were recovered from an abandoned well in southwest Itawamba County, north of Nettleton. Nearly twelve (12) years after Seal's mysterious disappearance, Swann, a thirty-four-year-old Pontotoc resident, was charged with killing Seal while engaged in the commission of the crime of armed robbery.

¶3. Swann was indicted on April 2, 1998, accordingly:

> Ronnie Lee Swann . . . on the 8th Day of February, . . . 1986, . . . did wilfully, unlawfully and feloniously and with deliberate design kill and murder John Edward Seal, a human being, while he, the said Ronnie Lee Swann, was engaged in the commission of the crime of Armed Robbery, said Capital Murder being in violation of Section 97-3-19 (2) (e), Mississippi Code 1972 Annotated, as amended . . . .

¶4. Six issues are now before this Court:

  1. Whether the trial court erred in denying Swann's pretrial motion for a change of venue;

  2. Whether the trial court erred in denying jury instruction D-11, an instruction focusing upon the prior inconsistent statements given by an eyewitness;

  3. Whether the verdict of the jury was against the overwhelming weight of the evidence;

  4. Whether the trial court erred in denying the defendant's motion to quash the indictment;

  5. Whether the trial court erred in overruling the defendant's motion to disclose the identity of the confidential source who provided law enforcement authorities information concerning the disappearance of Seal and the location of his skeletal remains; and

  6. Whether the trial court, during the sentencing phase of the bifurcated trial, erred in giving a jury instruction authorizing the jury to impose a sentence of life imprisonment without parole.

## FACTS

¶5. During the early morning hours of February 8, 1986, Seal was killed near an abandoned well in rural Itawamba County. A tip from an anonymous source led investigators from the Tupelo Police Department and the Itawamba County Sheriff's Department to the well in Itawamba County where members of the dive team from the Tupelo Fire Department were able to recover eighty-five to ninety percent of Seal's skeletal remains along with much of Seal's clothing. The property where Seal's body was recovered was referred to as "the old Swann property down on Culver Road."

¶6. According to the testimony of Seal's father, before Seal's disappearance around midnight on February 7, 1986, Seal was on his way back home from Memphis after a visit to the Veteran's Administration Hospital. According to Mark Haygood, who was at the time employed by the Lee County Sheriff's Office, Seal's car was stuck in a median near the Belden exit on Highway 78. Johnny Finney, a detective with the Tupelo City Police at the time, testified that he followed many leads regarding the disappearance of Seal. These leads included dragging through bodies of water and also an investigation into Seal's ex-wife and insurance policies naming her as the beneficiary. Finney testified that none of the leads he followed had any connection to Swann.

¶7. The confidential informant first contacted Sheriff Joe Bryant of Union County. The informant only offered to provide the information regarding Seal's disappearance if the sheriff promised to protect his identity. The informant accompanied Sheriff Bryant to the location where he believed that Swann and Holly Jo Poe were present when the body of Seal was thrown into the well. Sheriff Bryant testified that he was satisfied that the confidential informant was not involved in the crime based upon the conversation that he had with the informant.

¶8. Lieutenant Michael Berthay, with the Mississippi Highway Patrol Criminal Investigation Bureau, testified that he met with Poe and Swann to question them about the homicide. Poe initially denied any knowledge of the matter. Poe was given a polygraph test after her initial statement and a second statement, both of which showed deceptive responses. On her third statement, Poe revealed all the details that led to the indictment of Swann. She admitted that she had given several prior inconsistent statements to law

enforcement, but stated that her last version was the truth.

¶9. Swann, at the time of Seal's disappearance in 1986, was a twenty-three-year-old resident of New Albany in Union County. Swann had lived on "the Old Swann property" until he was nine years of age, and his grandparents had moved away from there in 1982. At the time of Swann's trial in 1999 for Seal's murder, Swann was thirty-five years of age and the father of four children, one of whom was born to Poe, the State's key witness.

¶10. According to Poe, Seal was seated inside his automobile when Swann stopped under the pretense of rendering assistance to Seal. Swann, in the presence of Poe, took Seal to Swann's old home place in Itawamba County where, after enticing Seal out of the car, Swann struck Seal twice in the head with a nunchaku (commonly called "nun-chucks") and slit his throat with a knife. After a nonproductive search of Seal's clothing for money, Swann dropped Seal's body into a well.

¶11. Poe testified as follows:

> And he pushed me back and he grabbed Mr. Seal[] around the arms and went to pulling him towards the well. And he got him to the well, and one of Mr. Seal's shoes fell off while Ronnie was dragging him to the well. And he got him to the well, and he throwed him over in it, and he hollered, told me to bring him the shoe. And I wouldn't do it [to] start with. And he told me I'd better or else the same thing would happen to me. (Witness crying.) And so I reached and got the shoe and brought it to Ronnie and he throwed it in the well with Mr. Seal[]. (Witness Crying).

¶12. According to the testimony of Poe, Swann planned and intended to rob Seal. After taking Seal to "the old Swann property," he "ripped" Seal's throat with the knife and stuffed his body headfirst into the abandoned well. Swann told Poe "to make sure I always kept my mouth shut and not forget that, that I'd better keep my mouth shut."

¶13. Several hours after the killing, Swann and Poe drove to Florida. Swann testified he remembered going to Florida with Poe in February of 1986, but could not remember the day or the date. According to Swann, "Holly had some bad check, and she figured she'd go to prison for it, so we decided to go to Florida." Swann testified he had $600 from "my income tax check through William Gates' pawn shop, quick cash thing."

¶14. Swann denied that he and Poe stopped at any time to help an individual in a stalled vehicle. He denied ever seeing Seal. Swann stated that he did not rob anyone and did not commit a murder.

¶15. At trial, Poe identified the knife used by Swann to cut Seal's throat. Swann's ex-wife, Mary Swann, testified that she purchased the knife for Swann in 1993, several years after the murder of Seal. Swann also testified that the knife found in his home by law enforcement was purchased for him by his ex-wife, seven years after Seal's mysterious disappearance.

¶16. Swann renewed a motion to compel disclosure of the confidential informant. He also moved to dismiss the charge on the same ground "based on the lack of the ability to confront and cross-examine what we feel like is essentially the main witness against Mr. Ronnie Swann." Motions by Swann for directed verdict, disclosure, and to dismiss the charges were overruled. At the close of the evidence, Swann's renewed motion for a directed verdict of acquittal was denied. His request for peremptory instruction was also denied. The jury found Swann guilty of capital murder. Swann's motion for JNOV or, in the alternative, a

new trial, was also denied.

**ANALYSIS**

### I. **DID THE TRIAL JUDGE ABUSE HIS DISCRETION IN DENYING SWANN'S MOTION FOR A CHANGE OF VENUE?**

¶17. Swann argues that because of the publicity and media coverage, the judge should have granted his request for a change of venue. Swann's motion for a change of venue was supported by affidavits from three citizens who stated that Swann could not receive a fair and impartial trial in Itawamba County. Swann also called Mary Bishop, a convenience store manager in Itawamba County, to testify that she came in contact with many people who had heard about the case. Area newspapers and several videotapes containing news reports regarding the case were introduced into evidence at the trial. Some of the reports indicated that Swann had prior felony charges. Swann successfully created a presumption that it was impossible for a fair trial to be had in the existing venue.

¶18. The State attempted to rebut that presumption through a pre-trial hearing conducted on September 1, 1998. Five witnesses, Itawamba County Supervisors from different districts, testified that Swann could receive a fair trial in Itawamba County. After hearing the arguments of both parties and reviewing the news articles and videotapes, the circuit judge took the matter under advisement. The trial began about six months later, on March 15, 1999.

¶19. The State can rebut the presumption that the defendant could not receive a fair trial by proving from voir dire that the trial court impaneled an impartial jury. *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997). During voir dire, the trial judge questioned the eighty-eight prospective jurors concerning whether they heard anything about this case in the news or from any other source. Swann's trial attorney also had the opportunity to inquire about the pre-trial publicity during voir dire. At the close of voir dire, the circuit judge again asked the prospective jurors whether anyone knew about the facts of this case from any source of information. The circuit judge was satisfied that Swann could receive a fair trial; therefore, he denied the motion for change of venue.

¶20. Motions for a change of venue are left to the trial court's sound discretion. *Davis v. State*, 767 So. 2d 986, 993 (Miss. 2000); *Hickson v. State*, 707 So. 2d 536, 542 (Miss. 1997). Based upon a review of the record, this Court is also satisfied that Swann could and did receive a fair trial. This case passes the two-part test found in *Holland* which looks at the extent of media coverage and its inflammatory nature, as well as the effect upon the prospective jurors. *Holland*, 705 So. 2d at 336-37. Those jurors who stated that their knowledge would affect the verdict were removed, and those jurors who remained stated that their knowledge would not prevent them from serving impartially. *Id.*

¶21. Swann does not argue that the media coverage and publicity was inflammatory, and based upon a review of the record, the news coverage appears objective. As for the extent of the coverage, the case spanned a period of twelve years and received a fair amount of attention due to the time that passed before Swann was charged with the crime. However, over six months of silence passed between the news coverage and the trial. Furthermore, the publicity "was not widespread and did not reach massive or epidemic proportions." *Box v. State*, 610 So. 2d 1148, 1153 (Miss. 1992). Based upon a review of the record, Swann received a fair and impartial jury. Therefore, this Court finds that the circuit judge did not abuse his discretion in denying the motion for a change of venue.

## II. DID THE TRIAL JUDGE ERR IN REFUSING TO GRANT JURY INSTRUCTION D-11?

¶22. Swann's proposed jury instruction D-11 provided the following:

> You have heard evidence that Holly Joe [sic] Poe made statements prior to trial that may be inconsistent with her testimony at trial. If you believe that inconsistent statements were made, you may consider the inconsistencies in evaluating the believability of her testimony.

The State objected to this instruction, and the circuit judge refused the instruction without an explanation. This Court has held that it is not an improper comment on the testimony of a witness to instruct the jury regarding the proper effect to give to prior inconsistent statements by witnesses testifying at trial. *Ferrill v. State*, 643 So. 2d 501, 505 (Miss. 1994); *McGee v. State*, 608 So. 2d 1129, 1135 (Miss. 1992).

¶23. The refusal of proposed Instruction D-11 would be error if no other instructions regarding the believability of Poe's testimony were provided to the jury. However, the jury did hear other instructions regarding the credibility of the witnesses and the consideration of conflicts in their testimony. "A [trial] court must view jury instructions as a whole, and not individually, in order to decide whether the jury was adequately instructed." *Chatman v. State*, 761 So. 2d 851, 855 (Miss. 2000); *Bell v. State*, 725 So. 2d 836, 848-49 (Miss. 1998). Furthermore, a trial judge is not under an obligation to grant redundant instructions. *Davis v. State*, 568 So. 2d 277, 280-81 (Miss. 1990). Instruction 13 (D-4) provided the following:

> As the sole and exclusive judges of the facts, it is for you, and you alone, to determine the credibility or believability of the evidence. It is for you to determine what witness or witnesses, or other forms of evidence, you will believe, either in whole or in part. If upon a consideration of the evidence in this case, you find that there is a conflict in the testimony of the witnesses, it is your duty to settle this conflict. In doing so, you should consider all the factors relevant to determining credibility.
>
> In passing upon credibility, you may consider all the facts and circumstances of the case, the witness' manner of testifying and demeanor on the stand, their intelligence, their interest or lack of interest, their means and opportunity for knowing the facts to which they testify, the nature of the facts to which they testify and the probability or improbability of their testimony. You may also consider their personal credibility in so far as it may legitimately appear from the trial of this case.

In addition, Instruction C-1 provided that the jury should "consider . . . the testimony and statements of the witnesses and the exhibits offered and received."

¶24. Furthermore, as the State points out, Swann had the opportunity to cross-examine Poe regarding her prior inconsistent statements and, as evidenced by the record, Swann's attorney did so. Swann also argued in closing that Poe was untrustworthy, had previous forgery convictions, and had given several inconsistent statements. Given the jury instructions, the cross-examination of Poe, and Swann's closing argument, it is reasonable to believe that the jury did take Poe's prior inconsistent statements into account. Therefore, this Court finds that the circuit judge committed no error in refusing proposed Instruction D-11.

## III. WAS THE JURY VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

¶25. When determining whether a jury verdict is against the overwhelming weight of the evidence, all evidence supporting the verdict must be accepted as true, and this Court will reverse only when it is convinced that the trial judge abused his discretion in failing to grant a new trial. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997). This Court should not reverse a guilty verdict unless failure to do so would sanction an unconscionable injustice. *Hilliard v. State*, 749 So. 2d 1015, 1016 (Miss. 1999).

¶26. Swann argues that, because Poe's testimony is the only evidence linking Swann to the crime for which he was charged, the verdict was against the overwhelming weight of the evidence. He also argues that the only corroboration of Poe's testimony is the knife that was allegedly used to murder Seal. Swann's primary complaint is that the jury could not properly weigh Poe's testimony with regard to her credibility and prior inconsistent statements because they were not properly instructed concerning her testimony.

¶27. As stated in the previous issue, the jury instructions as a whole adequately informed the jury on weighing the testimony of witnesses. Additionally, the testimony of a single uncorroborated witness can sustain a conviction even though there may be more than one witness testifying to the contrary. *Williams v. State*, 512 So. 2d 666, 670 (Miss. 1987). Even if Poe was charged as an accomplice in this case, which she was not, her testimony would still support a conviction of Swann. *Johns v. State*, 592 So. 2d 86, 88 (Miss. 1991).

¶28. Without more, this Court could find that the weight of the evidence was sufficient to uphold a conviction of Swann. Nevertheless, other details in Poe's testimony put this Court at ease in determining that the weight of the evidence was sufficient. The following details and logical deductions help to corroborate Poe's testimony: (1) Swann admitted taking Poe by the old Swann home before, but stated that they just drove by it and that you could not see the well from the road. (2) Other than the one time that Swann admitted taking Poe by his old homestead, there is no explanation of how Poe knew about the well and of its location. (3) Poe's description of Seal at the location of Seal's vehicle was accurate. (4) Poe's observation that one of Seal's shoes came off while Swann was dragging his body to the well was also suggestive evidence. This is because only one shoe was recovered by the dive team. However, Poe did testify that the missing shoe was also thrown into the well, but this was after Seal was dumped in the well only wearing one shoe.

¶29. This Court finds that the weight of the evidence adequately supported the jury's verdict.

### IV. DID THE TRIAL COURT ERR IN DENYING SWANN'S MOTION TO QUASH THE INDICTMENT?

¶30. Swann argues that the indictment failed to state the elements of armed robbery and should have been quashed as per Rule 7.06 of the Uniform Rules of Circuit and County Court Practice, regarding the sufficiency of the indictment. Under Rule 7.06, the defendant should be fully notified of the nature and cause of the accusation. URCCC 7.06. However, formal and technical words are not necessary if the offense can be substantially described without them. *Id.*

¶31. Swann's argument lacks merit because the indictment charges Swann with capital murder while in the commission of the crime of armed robbery. Stating the elements of armed robbery in the indictment is not necessary. *Turner v. State*, 732 So. 2d 937, 948 (Miss. 1999). This Court's decision in *Turner* is dispositive of this issue. An identical indictment was found to be adequate in *Turner*. *See also Gray v. State*, 728 So. 2d 36, 70-71 (Miss. 1998).

## V. DID THE TRIAL COURT ERR IN OVERRULING SWANN'S MOTION TO DISCLOSE THE IDENTITY OF THE INFORMANT?

¶32. Swann contends that, due to the nature of the case (murder), and the detailed account of the facts provided by the informant, including knowledge of the location of the well, the informant's identity should have been revealed to allow the defense an opportunity to investigate his knowledge.

> Disclosure of an informant's identity shall not be required unless the confidential informant is to be produced at a hearing or trial or a failure to disclose his/her identity will infringe the constitutional rights of the accused or unless the informant was or depicts himself/herself as an eyewitness to the event or events constituting the charge against the defendant.

URCCC 9.04(B)(2).

¶33. This Court has ruled on this issue, finding that if the informant neither participated in the criminal activity nor witnessed the crime, then his name should not be disclosed. *Ray v. State*, 503 So. 2d 222, 224 (Miss. 1986). According to Sheriff Bryant, the informant in this case was not involved in the crime, and nothing in the record suggests that the informant was a participant or eyewitness to the crime. Swann sets forth no compelling arguments or reasons why the informant's identity should be revealed. Furthermore, there are important public policy considerations in protecting the identity of a confidential informant who does not participate or witness the actual crime. See *United States v. Moralez*, 917 F.2d 18, 19 (10th Cir. 1990). This issue lacks merit; and therefore, this Court finds no error.

## VI. DID THE TRIAL COURT ERR BY INSTRUCTING THE JURY ON THE SENTENCING OPTION OF LIFE WITHOUT PAROLE?

¶34. Swann contends that the trial judge erred in instructing the jury that it could return a verdict of life imprisonment without parole because, when Swann committed the crime in 1986, life without parole was not a sentencing option under Miss. Code Ann. § 97-3-21 (1994). The only two sentencing options at that time were death and life imprisonment.

¶35. This same issue has been ruled on in previous cases before this Court. *Conley v. State*, 790 So.2d 773, 803-04 (Miss. 2001). *Watts v. State*, 733 So. 2d 214, 233 (Miss. 1999); *West v. State*, 725 So. 2d 872, 877 (Miss. 1998). Those cases involved matters where crimes were committed before the statute allowing life imprisonment without parole was enacted. *Id.* The trials were not held until after the effective date of the statute. *Id.* This Court held that imposing the new sentencing option of life without parole does not violate the prohibition against ex post facto laws. *Id.* Therefore, this issue is also without merit.

## CONCLUSION

¶36. This Court finds no reversible error in the record. All of the issues raised by Swann are without merit. Therefore, the judgment of conviction and sentence of life imprisonment without parole are affirmed.

¶37. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT ELIGIBILITY FOR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, EASLEY AND**

**CARLSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**